UNITED STATES of America, Appellee,

v.

Raymond A. PORTER, Virginia R. Porter and Clifford B. Smith, Appellants.

No. 77–1884.

United States Court of Appeals, Eighth Circuit.

Submitted May 18, 1978.

Decided July 21, 1978.

Rehearing and Rehearing En Banc Denied Aug. 18, 1978.

David M. Korum, Sestric, Karoh, La-Barge & Korum, Kirkwood, Mo., for appellant; Kent E. Karohl, Kirkwood, Mo., on the brief.

Joseph B. Moore, Asst. U. S. Atty., St. Louis, Mo., for appellee; Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on the brief.

Before GIBSON, Chief Judge, HENLEY, Circuit Judge, and SCHATZ, District Judge.*

HENLEY, Circuit Judge.

In the fall of 1973 the Mercantile Bank of St. Charles County, Missouri, which was then known as the County Bank of St. Charles and which is hereinafter called the Bank, made a $250,000.00 loan to Kent Enterprises, Inc. of Clayton, Missouri, hereinafter referred to as Kent. Repayment of the loan to the extent of 90% of principal and interest was guaranteed by the Small Business Administration (SBA), an agency of the United States.

In connection with its guaranty SBA made a number of requirements including requirements of guaranties from various persons and corporations who and which would become liable to SBA should the agency be required to comply with its own guaranty to the Bank. This case involves SBA's requirement that the loan be guaranteed to the extent of $25,000.00 by Raymond A. Porter and his wife, and to a like extent by Clifford B. Smith. Mr. Porter and Mr. Smith appear to have been shareholders in and directors of Kent. Other guaranties that will be mentioned were required and apart from the guaranties other requirements were made.

The Porters and Smith executed contract documents on October 18, 1973. The loan was actually closed on October 31. By the spring of 1975 the loan was in default to the extent of more than $200,000.00. SBA was required to honor its guaranty, and

---

* The Honorable Albert G. Schatz, United States District Judge, District of Nebraska, sitting by designation.

after it did so the Bank assigned to it the Bank's note and all rights thereunder including alleged rights against the Porters and Mr. Smith. By August, 1976 the amount due on the obligation was approximately $210,000.00, and in January, 1977 the government commenced this action against Mr. and Mrs. Porter and Mr. Smith, hereinafter called defendants, in the United States District Court for the Eastern District of Missouri.[1]

The defendants answered in due course and denied liability. There was some discovery in the case, including the taking of the deposition of Oliver J. Miller, the President of the Bank. Thereafter both sides moved for summary judgment. The defendants supported their motion with their own affidavits.

The case was on the docket of Chief District Judge James H. Meredith, who assigned the cross motions for summary judgment to a United States Magistrate for consideration, report and recommendation as authorized by 28 U.S.C. § 636(b)(1)(B). In August, 1977 the Magistrate filed a full report which concluded with the recommendation that the government's motion for summary judgment be granted and that the motion of the defendants for such judgment be denied. That recommendation was accepted by Judge Meredith and a summary judgment in favor of the government was duly entered. This appeal followed.

### I

In January, 1973 the Bank and SBA entered into an underlying agreement whereby the SBA agreed to guarantee, within limits, the repayment of certain loans made by the Bank provided that the Bank and the borrower complied with terms and conditions imposed by SBA.

Those terms and conditions might include requirements as to collateral and requirements that personal guaranties be forthcoming to protect the agency should it be required to honor its own guaranties. In the case of a corporate borrower personal guaranties might be required from key corporate personnel and their spouses and from other corporations with which the borrower was connected or affiliated. Private guarantors were expected to sign a printed SBA form entitled "Small Business Administration (SBA) Guaranty." That form provided, among other things:

> . . . The Undersigned hereby grants to Lender full power, in its uncontrolled discretion and without notice to the undersigned, but subject to the provisions of any agreement between the Debtor or any other party and Lender at the time in force, to deal in any manner with the Liabilities and the collateral, including, but without limiting the generality of the foregoing, the following powers:
>
> (a) To modify or otherwise change any terms of all or any part of the Liabilities or the rate of interest thereon (but not to increase the principal amount of the note of the Debtor to Lender), to grant any extension or renewal thereof and any other indulgence with respect thereto, and to effect any release, compromise or settlement with respect thereto;
>
> (b) To enter into any agreement of forbearance with respect to all or any part of the Liabilities, or with respect to all or any part of the collateral, and to change the terms of any such agreement;
>
> (c) To forbear from calling for additional collateral to secure any of the Liabilities or to secure any obligation comprised in the collateral;
>
> (d) To consent to the substitution, exchange, or release of all or any part of the collateral, whether or not the collateral, if any, received by Lender upon any such substitution, exchange, or release shall be of the same or of a different character or value than the collateral surrendered by Lender;

---

1. Also named as defendants were two corporate guarantors of the Kent obligation, namely Economy Equipment Co. and Kenton Controls, Inc., both of Clayton. Those corporations did not defend the case and are not involved in this appeal. It may be suspected that they were insolvent when the suit was filed.

(e) In the event of the nonpayment when due, whether by acceleration or otherwise, of any of the Liabilities, or in the event of default in the performance of any obligation comprised in the collateral, to realize on the collateral or any part thereof, as a whole or in such parcels or subdivided interests as Lender may elect, at any public or private sale or sales, for cash or on credit or for future delivery, without demand, advertisement or notice of the time or place of sale or any adjournment thereof (the Undersigned hereby waiving any such demand, advertisement and notice to the extent permitted by law), or by foreclosure or otherwise, or to forbear from realizing thereon, all as Lender in its uncontrolled discretion may deem proper, and to purchase all or any part of the collateral for its own account at any such sale or foreclosure, such powers to be exercised only to the extent permitted by law.

The obligations of the Undersigned hereunder shall not be released, discharged or in any way affected, nor shall the Undersigned have any rights or recourse against Lender, by reason of any action Lender may take or omit to take under the foregoing powers.

If SBA agreed with the Bank to guarantee a particular proposed loan, the agency would execute and mail to the Bank another SBA form entitled "Authorization Approving Lender's Request For SBA Guaranty." That form consisted of two pages of printed matter with blank spaces to be filled in appropriately; additional pages might be attached to the form if necessary.

Section 3 of the form dealt with (a) repayment terms, interest rates and maturity; (b) use of the proceeds of the loan; (c) loan conditions required by the lender and by SBA. In connection with § 3(c) there were to be listed requirements as to liens, security instruments, insurance, guaranties, and the like.

**2.** *See* n. 1, *supra.*

**3.** According to the Miller deposition, Willmering in 1973 either was or had been an officer in

II

In 1973 Kent was one of a trio of corporations that were controlled by Hanson B. Freeman with whom his son, William H. Freeman, was associated in business. Both of the Freemans were married. The two corporations, other than Kent, were Economy Equipment Co. and Kenton Controls, Inc. of Clayton, Missouri.[2]

In the summer of 1973 Kent was obligated to the extent of about $110,000.00 to Fidelity Bank & Trust Co. of Creve Coeur, Missouri, and it was also indebted to Edward W. Willmering for rent on space that it had leased from Willmering.[3]

In those circumstances Hanson B. Freeman and his son approached the Bank with the end in view of negotiating a $250,000.00 loan. The proceeds of the loan were to be used to pay off the obligation to Fidelity and for "working capital." The Hansons dealt with Mr. Miller who had had some dealings with Economy Equipment Co. while he was Vice President and Treasurer of Fidelity. Mr. Miller had some knowledge of the over-all Freeman operations, and he knew that part of the proceeds of the loan, if made, would be disbursed to Willmering.

As stated, the defendants Porter and Smith owned stock in Kent and were members of its Board of Directors. Other individuals connected with the Freeman operations were Dr. and Mrs. Louis W. Conradt and Arlie A. Appler, Jr.

On October 4, 1973 SBA agreed with the Bank to guarantee the loan to Kent and mailed to the Bank the authorization form that has been described. The particular form sent to the Bank in connection with the Kent loan consisted of the basic two printed pages plus a third page that had been attached to them. The third page was added for the purpose of setting out § 3(c) of the authorization which contained the specific requirements of SBA in connection with the Kent loan.

one or another of the corporations controlled by *Hanson B. Freeman.*

Section 3(b) of the form stipulated that the proceeds of the loan were to be used to discharge Kent's obligation to Fidelity, and that the balance of the proceeds was to be used solely for "working capital." The term "working capital" was not defined, and the authorization did not reveal that any loan proceeds were to be used to discharge any antecedent debt of Kent other than the debt to Fidelity.

Section 3(c) spelled out ten requirements that the SBA had made in connection with the loan. We will summarize the ones that are important to this case.

The three Freeman corporations were required to give the Bank first liens on their assets. The individual Freemans, father and son, and their wives were required to guarantee the loan to the extent of 100%. Additional guaranties were required of Mr. and Mrs. Porter, Mr. Smith, Dr. and Mrs. Conradt and Arlie A. Appler. Those guaranties were to be in the sum of $37,500.00 each.

Additionally, there was a requirement that Willmering execute a "standby agreement" in the amount of $14,000.00, and that a certificate of deposit in the amount of $30,000.00 be furnished for a period of one year or until the principal balance of the loan should be below $220,000.00.

Prior to signing the guaranty documents required of them, Porter and Smith insisted that the amounts of their guaranties be reduced from $37,500.00 each to $25,000.00 each. The Bank and SBA agreed to those reductions, and, of course, Smith and Porter were aware of them when they signed the guaranty contracts on October 18. However, they may not have been aware of the fact that the requirement that Willmering provide a $14,000.00 "standby agreement" had been deleted.

Between October 18 and October 31, 1973, when the loan was closed, there were three other changes that were negotiated and agreed to by the Bank and by SBA. Apparently, the $30,000.00 certificate of depos-

it that has been mentioned was to be supplied by Willmering; the amount of that certificate was reduced to $12,500.00. The requirement that the Conradts guarantee the loan to the extent of $37,500.00 was deleted with the substitute requirement that Willmering would furnish a certificate of deposit in that amount.[4] Finally, the requirement that the wife of William H. Freeman become a personal guarantor of the Kent loan was deleted with the understanding that her husband would furnish the Bank with a certificate of deposit in the sum of $10,000.00.

There were a number of persons present at the closing of the loan, according to the Miller deposition, but he did not recall whether either Mr. Porter or Mr. Smith was present, and there is no reason to believe that Mrs. Porter was there.

$200,000.00 of the loan proceeds was credited to the account of Kent on the date of the closing of the loan. The other $50,000.00 was disbursed over the next few months.

Out of the original disbursement Kent drew six checks in varying amounts in favor of Willmering. Those checks totalled $30,800.00, and Mr. Miller was of the opinion, judging from the amounts of the checks, that Willmering used them to purchase certificates of deposit that he was required to furnish under the amended terms of the loan. As Miller pointed out, however, the total certificate of deposit obligation of Willmering was substantially in excess of the amount of the loan proceeds that he obtained.

### III

The issue before us is whether the district court erred in granting summary judgment in favor of the government.

Fed.R.Civ.P. 56 provides that a summary judgment may be granted to either a plaintiff or a defendant if the record before the district court establishes that the case

---

4. It will be noted that Willmering was required ultimately to supply certificates of deposit totalling $50,000.00.

presents no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. However, the fact that both sides may move for summary judgment does not automatically establish that either side is entitled to such a judgment. 10 Wright & Miller, Federal Practice & Procedure, § 2720, pp. 459–66.

The affidavits of the defendants are to the effect that when they signed the guaranty contract forms on October 18, 1973, copies of the original SBA loan authorization forms were attached to the contract documents, and that they relied on the requirements set out in the authorizations when they signed the guaranty contracts. Their affidavits are also to the effect that they were not aware of and had never consented to the changes in the original SBA requirements other than the reductions of their own exposures from $37,500.00 to $25,000.00.

The defendants' affidavits are contradicted to some extent by the deposition of Mr. Miller, and the contradiction raised factual issues as the magistrate recognized.

The defendants contended in the district court that the changes in the original SBA requirements released them from liability as guarantors, and they also contended that they were released because of the payments made to Willmering out of the proceeds of the loan.

In view of the broad language of the guaranty contracts, which has been quoted, the magistrate did not consider that the factual issues presented by the record were material. Specifically, he did not consider that the defendants were released from liability on their contracts because of changes in the original SBA requirements; nor did he consider that the nature of the loan was materially or impermissibly changed by the fact that part of the proceeds were paid to Willmering in satisfaction of past due rent. As stated, the district judge adopted the findings and recommendations of the magistrate.

In passing upon the government's motion for summary judgment the district court was required, and we are required, to view the case in the light most favorable to the defendants and to give them the benefit of all reasonable inferences favorable to them. Summary judgment is an extreme remedy, and a motion for summary judgment should not be granted unless it is clear beyond controversy that the moving party is entitled to judgment as a matter of law. *See, e. g., Weber v. Towner County,* 565 F.2d 1001, 1005 (8th Cir. 1977), and cases cited. But, it must be recognized that summary judgment is a useful tool whereby needless trials may be avoided, and it should not be withheld in an appropriate case. *Bellflower v. Pennise,* 548 F.2d 776, 778 (8th Cir. 1977); *Robert Johnson Grain Co. v. Chemical Interchange Co.,* 541 F.2d 207, 209 (8th Cir. 1976); *Percival v. General Motors Corp.,* 539 F.2d 1126, 1129 (8th Cir. 1976).

It is clear that on October 4, 1973 SBA made certain initial requirements as conditions to its willingness to guarantee repayment of the Bank's loan to Kent to the extent heretofore indicated, and that those requirements were set out in detail in the loan authorization form that has been described. However, we are satisfied to the requisite degree of certainty that even if copies of the loan authorization form were attached to the guaranty contracts signed by the defendants, the original SBA requirements did not become conditions to the obligations that the defendants assumed. As the defendants well knew, the original requirements had been changed already for their benefit, and they had no right to assume that other changes had not been made. Future changes were permitted by the contract documents themselves. As to the payments made to Willmering, we agree with the district court that those payments did not affect the obligations of the defendants.[5]

---

5. We observe that in determining that the factual issues in the case were not material the magistrate relied in substantial measure on

*United States v. Outriggers, Inc.,* 549 F.2d 337 (5th Cir. 1977), and *United States v. Immordino,* 534 F.2d 1378 (10th Cir. 1976). While

The judgment of the district court is affirmed.

those cases may be factually distinguishable from this one, they are supportive of the decision reached by the district court and that reached by this court.