**Mike TOLLESON, Plaintiff,**

v.

**EDUCATIONAL TESTING SERVICE
and South Carolina Department
of Education, Defendants.**

**Civ. A. No. 7:91–3284–21.**

United States District Court,
D. South Carolina,
Spartanburg Division.

Aug. 6, 1992.

Perry D. Boulier, Spartanburg, SC, for defendants.

Jo Watson Hackl, Greenville, SC, Samuel Franklin Adams, Spartanburg, SC, for plaintiff.

*ORDER*

TRAXLER, District Judge.

## I. *INTRODUCTION*

In this suit, Plaintiff ("Tolleson") sues the Educational Testing Service ("ETS") and the South Carolina Department of Education ("DOE"), alleging that the Defendants violated his right to due process of law as provided for under the fourteenth amendment.[1] The Defendants are moving for summary judgment pursuant to Fed.R.Civ.P. 56, claiming that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.[2] After reviewing the relevant caselaw, the court grants the Defendants' Motions for Summary Judgment.

## II. *THE FACTS*

The material facts are not disputed. Tolleson seeks certification to teach Social Studies in South Carolina's school system. As a prerequisite to certification, all applicants seeking certification must pass an examination, the National Teachers' Examination ("NTE") issued by the ETS. The purpose of the examination is to provide minimum competency levels in a given subject before the applicant is permitted to teach the subject on which he has been tested. The DOE's Regulation 43–52 provides that before an applicant can be considered for certification, he must

---

**1.** At the hearing on the motion, counsel for Tolleson conceded that this action was prosecuted under 42 U.S.C. § 1983 (1988).

**2.** Defendant ETS also interposed a Motion to Strike Plaintiff's Response, pursuant to Local Rule 12.06, which provides: "Any memorandum of opposing counsel must be filed with the Clerk within fifteen (15) days of the filing of the motion. Counsel shall furnish a copy of any such memorandum to opposing counsel at the time of filing. If no memorandum in opposition is filed

within fifteen (15) days, the Court will decide the matter on the record and such oral argument as the movant may be permitted to offer, if any...." Defendant ETS filed its Motion to Dismiss or, in the Alternative, for Summary Judgment on May 18, 1992. Tolleson did not respond to ETS's motion until July 30, 1992. Tolleson's response, therefore, is clearly untimely. Because the court grants the Defendants' Motions for Summary Judgment, the Motion to Strike and Plaintiff's untimeliness do not affect the judgment.

pass the competency exam as issued by the ETS.[3]

Tolleson took the NTE six (6) times, and his scores are as follows:

| DATE | SCORE |
|------|-------|
| 3/88 | 450 |
| 7/88 | 440 |
| 4/89 | 320 |
| 7/89 | 420 |
| 3/90 | 650 |

Thus, in March of 1990, the final time Tolleson took the NTE, he performed extremely well. In fact, Tolleson scored 230 points better than he had the last time he took the test. This marked improvement prompted the ETS to question the validity of Tolleson's score. Accordingly, ETS followed its own detailed procedures to check the accuracy of Tolleson's answer sheet. One of the procedures instituted by ETS to assess score validity is to compare the questioned score to the score of the examinee seated physically near to the examinee being investigated. This procedure was followed in Tolleson's case and proved very revealing: a great degree of correlation was found between Tolleson's answer sheet and that of the examinee seated next to him. (The court will refer to the examinee seated near Tolleson as X). Tolleson was issued test book # 4261, and X received # 4260.[4] Of the 150 responses possible on the examination, 129 of those answers are identical on both Tolleson's and X's answer sheets. Tolleson had 98 correct responses and 50 incorrect responses. X had 111 correct responses and 38 incorrect responses. Tolleson and X had identically correct responses to 98 questions—*i.e.*—all of the responses Tolleson answered correctly, and 31 identical responses to the questions both answered incorrectly. The long and the short of these coincidences is that the possibility of Tolleson and X answering all of the 98 correct responses the same and 31 out of 38 incorrect responses the same is less than 1 in 100,000,000.[5] Not surprisingly, ETS concluded that Tolleson's score was invalid.

Pursuant to their conclusion, ETS notified Tolleson that the validity of his score was questioned; and the score, pursuant to the agreement Tolleson made prior to taking the test, was subject to cancellation. ETS therefore advised Tolleson of the options available to him for resolving the matter. These options included:

(1) The examinee being questioned is invited to submit relevant information to support the validity of his score.

(2) The examinee may take a private retest, at no expense, in an attempt to confirm the suspect score. If the retest meets a range of 50–100 points within the suspect score, the questioned score is automatically cleared without further review.

(3) If the examinee believes the ETS's Board of Review is incorrect in questioning his score but is unwilling to retake the examination, he may have the ETS send a written summary of ETS's review board's decision to the entity needing the score—here, the DOE. Prior to electing this option, the examinee is afforded the opportunity to review ETS's entire submission and is informed that if this option is selected, the suspect score will cancelled. As with option (1), the examinee is invited to provide ETS with additional information to the DOE to authenticate his score's validity.

(4) The examinee, at no expense to him, may appeal to the American Arbitration Association ("AAA"). If the AAA finds that ETS's determination is unsubstantiated, the ETS immediately clears and releases the score without further review.

(5) Finally, the examinee, with no questions asked, may authorize ETS to cancel his score. The examinee's money is refunded to him.

3. The ETS is a non-profit organization which issues and administers standard examinations.

4. Test booklets are consecutively distributed, and Tolleson was seated diagonally from X. Tolleson should not have been seated by X, as provided for under ETS examine procedures; thus, the seating arrangement of Tolleson and X was suspect.

5. *See* Affidavit of Shirley Kane–Orr, supplying these statistics.

Tolleson did not elect any of these options.[6] Instead, Tolleson instituted this suit to compel ETS to release his scores to Defendant DOE so that DOE could take action in Tolleson's certification. As of the date that this action was filed, Tolleson still had not elected any option presented to him.

Tolleson states that because ETS will not release his score to DOE, he cannot be certified to teach Social Studies in South Carolina. Thus, Tolleson seeks an order from this court compelling ETS to validate and release his score. Tolleson also names DOE as a defendant, asserting the DOE and ETS are so inextricably bound to one another that "state action" is implicated and his right to due process is being deprived by the state. In addition to the declaration compelling validity, Tolleson seeks $50,000.00 compensatory damages.[7]

## III. DISCUSSION

The gravamen of the Complaint is that the State of South Carolina, through the Department of Education and S.C.Code Ann. § 59–26–30 (Law. Co-op.1976),[8] have empowered ETS to act with the full authority of the state. Plaintiff contends that because the state statute mandates that the NTE be taken as administered by the ETS, ETS is a state actor acting under state auspices. Because Tolleson cannot be certified to teach in South Carolina without valid scores from ETS, Tolleson contends that the state, operating through ETS, has deprived him of due process of law. The issue, therefore, is whether § 59–26–30 sufficiently clothes the ETS with the cloak of the state so that ETS's actions can be attributed to South Carolina. If this threshold determination is satisfied, the succeeding issue is what kind of process Tolleson is due and whether he was deprived

of the process due him. Recent Supreme Court pronouncements compel the conclusion that ETS did not act under color of state law and that there is not a sufficient nexus to ETS's action and the DOE so that ETS's actions can be fairly attributable to the state. Failing the threshold issue, the court does not address the issue of what process was due to Tolleson.

In a recent trilogy of decisions—*Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), and *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)—the Supreme Court has attempted to distill a uniform "test" to employ when a complainant is claiming that a private entity has acted under color of state law, and while so acting, has deprived the complainant of due process of law. When evaluating whether a private entity has become a state actor, the Court has considered the following tests to be of paramount importance in determining whether state action exists: (1) whether the private entity is performing functions traditionally the exclusive prerogative of the state. This is the so-called "public function test." This test applies only to private actors performing functions that traditionally have been the exclusive prerogative of the state. The purpose of this criterion is to ensure that due process standards are invoked only when the state can be said to be responsible for the defendant's conduct. *Blum*, 457 U.S. at 1004, 102 S.Ct. at 2786, *citing Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). (2) whether the state has compelled, coerced, or encouraged the conduct of the private entity to such a degree that the complained-of action is deemed that of the state. Mere acquiescence or approval by the state does not satis-

---

6. Tolleson was granted two extensions by ETS to weigh the options presented to him. Tolleson, even after granted this additional time, still failed to respond to ETS. Accordingly, as ETS originally advised Tolleson, the suspect score was cancelled.

7. At the hearing on the motions, counsel for Plaintiff conceded that monetary damages were not recoverable against DOE. Thus, this portion of the prayer, as to DOE, was withdrawn.

8. S.C.Code Ann. § 59–26–30(i) provides that "The State Board of Education shall ... [f]rom the effective date of this chapter, use the specific teaching area examinations of the National Teacher Examinations for certification purposes. The qualifying scores may be adjusted if new legal requirements or validity studies indicate such adjustments are necessary...." Thus, the statute provides that applicants seeking to teach in South Carolina must take the NTE and that the ETS is the entity charged with reporting the test scores.

fy this test. This test is often referred to as the "state compulsion test." *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2786, *citing Flagg Bros. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), and *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). (3) whether there is a sufficient nexus linking the conduct of the private entity with the state. This is the proverbial "nexus-joint action test." [9] *Blum,* 457 U.S. at 1005, 102 S.Ct. at 2786, *citing Jackson* and *Flagg Bros.*

Under any configuration of the above, whether one test or three separate tests, Tolleson fails to bring his claim within the ambit of conduct prohibited by the due process clause. The public function test searches for those functions that traditionally have been the exclusive prerogative of the state. In this case, neither ETS nor DOE is orchestrating a public function. Examination administration and the recitation of the examination results does not rise to the level of being a public function that the states have traditionally controlled and sponsored. Neither the state nor the DOE has exerted influence over ETS's security and testing procedures. As discussed *infra* in *Johnson v. Educational Testing Service,* 754 F.2d 20 (1st Cir.), *cert. denied* 472 U.S. 1029, 105 S.Ct. 3504, 87 L.Ed.2d 635 (1985), and *Langston v. ACT,* 890 F.2d 380 (11th Cir.1989), formulation, grading, and reporting of standardized tests is simply not an exclusive public function. As to the state compulsion test, this test examines the facts to determine if the state has coerced or significantly encouraged the defendant's conduct. In the instant case, this coercion does not exist. Here, the state statute merely provides that DOE shall use the NTE for teacher certification purposes. Thus, the ETS is a mere vehicle for reporting information; the ETS acts only as a medium for conveying examination results. The ETS has no authority to determine certification or make any judgments as to the qualifications of applicants. The state has not coerced any behavior because the DOE has not been involved in the decisions made by ETS. Finally, because ETS is not so inextricably tied to the state, there is no sufficient nexus connecting the behavior of ETS with that of the state. Indeed, there is no nexus at all. Here, the DOE has not yet rendered a determination as to Tolleson's certification; ETS makes no determinations as to certification because it merely reports examination scores. Accordingly, there is no basis for asserting a nexus or joint action supporting a finding of state action.[10]

Specific decisions from the courts of appeals examining alleged due process violations in the context of examination administration reveal that Tolleson does not have a due process claim as a matter of law. The seminal case, which is very similar to the case at bar, addressing this issue of state action because of a state agency's relationship with the ETS is *Johnson v. Educational Testing Serv.,* 754 F.2d 20 (1st Cir.), *cert. denied* 472 U.S. 1029, 105 S.Ct. 3504, 87 L.Ed.2d 635 (1985).[11] In *Johnson,* plaintiff Susan Johnson took the LSAT three (3) times; her first two scores were 317 and 323. Six months after the last score, Johnson scored a 623—a substantially higher score. As in the present action, ETS questioned the validity of Johnson's score and examined her answer sheet. ETS determined that Johnson had not taken the suspect test because

---

**9.** The Court itself is apparently not convinced that these three "tests" are not really a single test operating under different names: "Whether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation need not be resolved here." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 939, 102 S.Ct. 2744, 2755, 73 L.Ed.2d 482 (1982).

**10.** *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 939, 102 S.Ct. 2744, 2755, 73 L.Ed.2d 482 (1982), separated the nexus and joint action tests,

but *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 546 n. 29, 107 S.Ct. 2971, 2986 n. 29, 97 L.Ed.2d 427 (1987), appeared to have blended the two: "Absent proof of this type of close nexus between the [Government] and the challenged action of the [USOC], the challenged *action* may not be fairly treated as that of the [Government] itself." (citations and internal quotes omitted; emphasis supplied).

**11.** ETS, the defendant in this action, was also the defendant in *Johnson.*

experts concluded that the handwriting on the higher-scored answer sheet was not Johnson's. Johnson, however, had experts who swore that the handwriting was the same. Meanwhile, Johnson had been admitted to a public law school. ETS provided Johnson with virtually the same options as Tolleson was given. Like Tolleson, Johnson exercised none of the options but instituted suit against ETS, one of her claims being violation of due process. *Johnson,* 754 F.2d at 22–23. ETS moved for and was granted summary judgment. The First Circuit affirmed, rejecting Johnson's claim that ETS and public agencies requesting such scores for verification acted under color of state law. Thus, the First Circuit, relying on *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), and *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), held that there was no state action involved:

> Johnson contends that ETS is a state actor because the LSAT, which it administers, is a prerequisite to admission to nearly all law schools, many of which ... are state schools. Therefore, she argues, ETS exercises a virtual veto power over admission to law schools.... [T]he recent decisions of *Blum* and *Rendell–Baker* are fatal to her claim.

> \* \* \* \* \* \*

> [T]he formulation, grading, and reporting or standardized tests is not an exclusive public function.... In short, Johnson's due process claim cannot withstand the tests of *Blum* and *Rendell–Baker* and the district court properly entered summary judgment for ETS on the [due process] claim.

*Johnson,* 754 F.2d at 24–25 (citations omitted). Accordingly, under facts similar to the present action, the First Circuit affirmed summary judgment for ETS as to the due process claim.

Almost identical in fact and holding to *Johnson* is *Langston v. American College Testing Program a/k/a ACT,* 890 F.2d 380 (11th Cir.1989). In *Langston,* plaintiff Langston, who was slated for a football scholarship, took his college entrance exams but did not perform well enough to play football.

Accordingly, Langston retook the examination; and his score doubled, rising from 10 to 20. Defendant's computers automatically flagged test results by applicants who improve their score by six (6) points. As in the present case, the Defendant ("ACT") compared the scores of Langston, whose test book number was 413620, to the examinee seated next to him ("Y"), whose book number was 413619. Thus, Langston and Y sat adjacent to each other. ACT, as in this suit, found an unusual degree of similarity and correlation between Langston and Y's answers: the tests had 189 identical responses out of 219 possible answers. The two tests had identical wrong answers to 70 questions. Therefore, ACT questioned the validity of Langston's higher score. ACT then presented Langston with virtually the exact same options ETS presented to Tolleson. Plaintiff chose option (1) (*ante,* p. 159)—*i.e.*—denying any cheating and forwarding ACT several letters of recommendation. ACT then asked to review Langston's high-school transcript, which was refused. ACT then wrote to Langston's counsel advising that it was cancelling the higher score and requesting the high school to do likewise. Meanwhile, Langston matriculated, on a football scholarship, at the University of Alabama. When the university called to confirm Langston's scores, ACT refused comment. Accordingly, the university ruled Langston ineligible to play ball. Langston then sued, claiming, among other causes, violation of due process. The district court granted summary judgment in favor of ACT, and the Eleventh Circuit affirmed.

The Court of Appeals for the Eleventh Circuit rejected Langston's assertion that ACT was a state actor for purposes of state action. Equally, the Eleventh Circuit rejected the argument that ACT's involvement with the University of Alabama constituted state action:

> The Supreme Court has emphasized that a mere showing that a private person performs a public function is not enough to establish state action.... The University of Alabama and a large number of other institutions, both public and private, rely on ACT to evaluate students for admis-

sions. ACT's taking on this public function, however, does not make ACT a state actor under the public function test.... In the present case, plaintiff has failed to show that the University of Alabama, or any other agency of a state, has exerted influence over ACT's security decisions. Plaintiff does not meet the requirements of the nexus/joint-action test or any of the other tests for state action, and therefore ACT is entitled to judgment as a matter of law on plaintiff's § 1983 claims.

*Langston*, 890 F.2d at 384–85 (citations omitted). Applying *Langston*, Tolleson's due process claim fails. The courts rule that testing services and their providing information to state agencies simply does not rise to the level of constituting "state action" because there is no nexus connecting the actions of ETS and the state.

While the Fourth Circuit has not directly addressed this issue, its precedents reveal that it would likely follow *Johnson* and *Langston*. In *Arlosoroff v. National Collegiate Athletic Assoc.*, 746 F.2d 1019 (4th Cir.1984), the Fourth Circuit applied the state action principles of *Blum* and *Rendell–Baker* to the National Collegiate Athletic Association, of which approximately one-half of its members are public institutions. Distinguishing earlier cases that held that the NCAA was a state actor, the Fourth Circuit observed, in light of *Blum* and *Rendell–Baker*:

There is no precise formula to determine whether otherwise private conduct constitutes 'state action.' After sifting facts and weighing circumstances, the inquiry in each case is whether the conduct is fairly attributable to the state.

\* \* \* \* \* \*

These earlier cases rested upon the notion that indirect involvement of state governments could convert what otherwise would be considered private conduct into state action. That notion has now been rejected by the Supreme Court, however, and its decisions require a different conclusion.

*Arlosoroff*, 746 F.2d at 1021, *citing Blum* and *Rendell–Baker.* *Johnson*, 754 F.2d at 24. The ETS is far less of a state actor than the NCAA. Whereas the NCAA can actually disqualify athletes from collegiate competi-

tion, the ETS merely reports tests scores. *Arlosoroff*, 746 F.2d at 1020. The ETS lacks authority to decide who will be admitted or rejected by colleges and universities. The ETS, therefore, is a mere vehicle—a medium for reporting information, not issuing judgments based on the information reported. *See also K.D. v. Educational Testing Serv.*, 87 Misc.2d 657, 386 N.Y.S.2d 747 (N.Y.Sup. Ct.1976) (same).

## IV. *THE SUMMARY JUDGMENT STANDARD*

The Federal Rules of Civil Procedure state, as to a party who has moved for summary judgment:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Rule 56(c). Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue of such material fact is "genuine" if the evidence so offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257, 106 S.Ct. at 2515. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the non-moving party. *United states v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the movant has

made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific material facts exist which give rise to a genuine issue. *Id.* at 324, 106 S.Ct. at 2553. Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce evidence of the existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

Summary judgment serves the useful purpose of disposing of meretricious, pretended claims before the court and parties become entrenched in frivolous litigation. *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987). Moreover, although summary judgment is a more extreme remedy, the courts should not be reluctant to grant summary judgment in appropriate cases; indeed, summary judgment is mandated where appropriate. *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989); *Meiri v. Dacon* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *United States v. Porter*, 581 F.2d 698, 703 (8th Cir.1978); *Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103, 134 (S.D.N.Y.1989); *Burleson v. Illinois Farmers Ins.*, 725 F.Supp. 1489, 1490 (S.D.Ind.1989). In a recent trilogy of decisions—*Celotex Corp v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)—the Supreme Court has consistently reaffirmed its endorsement of pretrial resolution and summary disposition of baseless actions. These decisions reflect the mandatory nature of Rule 56. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court held:

> The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.' ... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have not factual basis.

*Id.* at 327, 106 S.Ct. at 2555 (citations omitted). In the instant action, summary judgment is appropriate because there are no disputed facts. Also, the Defendants have demonstrated that Tolleson's putative claim is not recognized by the law. The Defendants are, therefore, entitled to judgment as a matter of law as Rule 56(c) mandates.

## V. CONCLUSION

The caselaw is uniform in holding that there is no due process violation when the ETS reports test scores to state agencies. Neither the ETS's acting alone, nor operating in concert with the state or state agencies, constitutes the requisite "state action." Tolleson simply does not have a cognizable claim.

**THEREFORE, THIS COURT ORDERS, ADJUDGES, AND DECREES** that Educational Testing Service's Motion for Summary Judgment is **GRANTED. IT IS FURTHER ORDERED** that the Department of Education's Motion for Summary Judgment is likewise **GRANTED.**

**IT IS SO ORDERED.**