AMERICAN CABLE TECHNOLOGIES
SERVICES, INC., Plaintiff,

v.

AT & T CORP., Defendant.

No. 99–5070–CV–SW–4.

United States District Court,
W.D. Missouri,
Southwestern Division.

April 25, 2001.

Steven Hurley Mustoe, Kurlbaum, Stoll, Seaman, Suter & Mustoe, Kansas City, MO, for American Cable Technologies Services, Inc., plaintiffs.

R. Jeffrey Harris, Bryan Cave LLP, Kansas City, Louis F. Bonacorsi, Bryan Cave, St. Louis, MO, for American Telephone & Telegraph Co., defendants.

## *ORDER*

FENNER, District Judge.

Presently before the Court is Defendant, AT & T Corporation ("AT & T")'s Motion for Summary Judgment against the Plaintiff, American Cable Technologies Services, Inc., ("ACT"). This case arises out of an alleged tortious interference by AT & T with a contract/business expectancy between ACT and Southwestern Bell Telephone Company ("SWB"). For the reasons set forth below, the Defendant's Motion is hereby GRANTED.

## *DISCUSSION*

### I. Standards for Granting a Summary Judgment

Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, it is the court's obligation to view the facts in the light most favorable to the adverse party and to allow

the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Inland Oil and Transport Co. v. United States*, 600 F.2d 725, 727–28 (8th Cir.1979).

If there is no genuine issue about any material fact, summary judgment is proper because it avoids needless and costly litigation and promotes judicial efficiency. *Roberts v. Browning*, 610 F.2d 528, 531 (8th Cir.1979); *United States v. Porter*, 581 F.2d 698, 703 (8th Cir.1978). The summary judgment procedure is not a "disfavored procedural shortcut." Rather, it is "an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273 (8th Cir.1988). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for trial about an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, the absence of genuine issues of material fact. However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

The nonmoving party is then required to go beyond the pleadings and by affidavits, depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* A party opposing a properly supported motion for summary judgment cannot simply rest on allegations and denials in the pleading to get to a jury without any significant probative evidence tending to support the complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

At the summary judgment stage the judge's function is not to weigh the credibility of the evidence, but rather to determine whether a genuine issue of material fact exists. *Id.* A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The evidence favoring the nonmoving party must be more than "merely colorable." *Id.* at 2511. When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted).

## II. Facts

Plaintiff ACT was formed as a new business venture to remove derelict underground utility cables for the purpose of recycling the copper within the lines. In early 1994 Plaintiff obtained two contracts with SWB to remove underground cable in the Southwestern Missouri area. Plaintiff paid SWB approximately $7,500.00 for the right to extract the cable within the contract region. Plaintiff had never extracted any cable prior to the two contracts at issue herein and has not extracted cable since the contracts were canceled in July of 1994.

Plaintiff utilized a method of extraction which it terms as the "pot and pull" method. Essentially, Plaintiff's employees would mark the underground cable on two ends at varying distances apart. They would dig a hole at each end and sever the dead cable in each hole. They would

then pull back the outer sheath at one end and attach the inner copper core to a backhoe. The backhoe would then pull the inner core out of the sheath until the entire core of the cable had been removed. The sheath, partially made of lead, was left in the ground. Plaintiff would then continue with this procedure in the next section of cable. This method of extraction did not violate any Missouri laws.

During the course of extraction, Plaintiff would often need to remove cable from areas where the SWB cable intersected with other "active" cables from both SWB and other utilities. Plaintiff states that it was fully aware of the need for caution when working around active cables and maintains at all times relevant herein that it used reasonable caution. Damage to an active fiber-optic cable can be a very serious and expensive problem.

In July of 1994 Plaintiff began an extraction of SWB cable in an area where an AT & T active fiber-optic cable crossed over the SWB at a perpendicular angle.[1] As was its standard practice, ACT contacted AT & T and notified them of its intent to dig in the area. AT & T sent Gary Brooks, an outside plant technician, to monitor ACT's activities. After several days of monitored work, ACT reached the area where the SWB and AT & T wire intersected. ACT planned on pulling the cable from the area the next morning beginning at 7:00 a.m. An issue of fact remains as to whether Brooks arrived on time the next morning. He claims that he arrived at or before 7:00 a.m. while ACT claims that he did not arrive until approximately 8:45 a.m.

In either event, ACT had already begun digging when Brooks arrived. ACT claims that Brooks became very upset when he saw that the workers had begun extracting the cable prior to his arrival. ACT further claims that a heated discussion ensued in which Brooks stated that he would have to file a "near miss" report regarding ACT's digging near AT & T's active wire. Brooks admits that he informed ACT of his intention to file a near miss report and he admits to being "disappointed" that they had begun the work before he arrived. The record reflects that the location of the AT & T cable was known to ACT. The record also reflects that no digging occurred in the proximity of the cable and the cable was not damaged.

Soon thereafter Brooks filed with AT & T a "Damage Prevention Defect Report" which has been loosely referred to as a "near miss report" in this lawsuit. At that point officials from AT & T contacted SWB and notified them of the incident. Neither party has produced Brooks' near miss report into the record, nor has either party introduced competent evidence as to what precisely was conveyed to SWB by AT & T.[2] As best the Court can determine

---

1. Throughout Plaintiff's Statement of the Facts Plaintiff misrepresents the record to the Court. For instance, Plaintiff claims that Defendant's Statement of Uncontroverted Facts in paragraphs 14, 17, 18, 19, and 20 are in controversy. However, Defendant served upon Plaintiff Requests for Admissions in which Plaintiff admitted as true each of these statements. It defies the purpose of pretrial discovery to admit that something is true during discovery and then deny the exact same statement when confronted with it during summary judgment. Plaintiff is admonished for attempting such chicanery.

2. Plaintiff represents in its Statement of Uncontroverted Facts that "AT & T's complaint falsely accused ACTS of nearly striking an AT & T cable and requested that SWB cancel its contracts with ACTS." Plaintiff cites the Court to an excerpt of a deposition given by Kay Bradford of SWB. However, Ms. Bradford testified that she never spoke with anyone at AT & T regarding this matter and her only communications were with SWB field employees. Accordingly, her testimony is not competent evidence of what AT & T communicated to SWB.

from the incomplete record, the uncontroverted and competent evidence reveals that AT & T simply conveyed to SWB that a "near miss" occurred.

In response to this complaint lodged by AT & T, SWB sent two field personnel, Ralph Feagan and Phillip Mullen, out to inspect the work site.[3] Neither Mullen nor Feagan had any specific knowledge of the contract between SWB and ACT and neither man was aware of AT & T's near miss complaint. They were contacted by SWB's Complaint Department and told that there had been an allegation that one of their contractors was digging too closely to an AT & T line and that the cable was not being fully removed from the ground. Based on these complaints they were sent to investigate. Feagan testified that he observed the site and reported his observations to Kay Bradford, the contract supervisor responsible for the ACT contract. He reported to Bradford that the lead sheathing of the cable was being left in the ground after the extraction of the copper and that this may cause SWB problems in the future. He also reported that one of the pits dug by ACT was "close" to the AT & T easement.[4] Neither Mullen nor Feagan made any recommendations to Bradford, they simply reported their observations of the site.

After SWB's field investigation was completed, Bradford canceled both contracts with ACT and ordered that it cease all extraction projects. This cancellation occurred the next day on July 11, 1994. The cancellation letters do not reveal any reasons as to why the contracts were terminated. It is not completely clear in the record, but it appears that the final decision to cancel the contracts was made by James Melvin McDuff. McDuff, the regional manager for the area, testified that he did not specifically recall terminating these contracts, but that he was the person with the authority to do so. He also testified that SWB would never terminate a contract with a contractor based solely on the allegations of an outside entity and it was SWB's common practice to investigate all complaints and base its decisions on its own internal investigations.

ACT never received another contract from SWB or any other utility for extraction of cable lines. The business is now apparently defunct. Plaintiff brought the present suit in this Court claiming that AT & T tortiously interfered with its contract with SWB. ACT claims business damages and business expectancy damages for ten years from the date of the alleged tortious interference.

### III. Analysis

■ In order to state a cause of action for tortious interference with a contract or business expectancy in Missouri a plaintiff must show each of the following:

---

**3.** Again, Plaintiff misrepresents the record to the Court. Plaintiff states in paragraph 38 of its uncontroverted facts that "SWB did not conduct its own investigation of AT & T's near miss report." This statement is made in the face of undeniable evidence to the contrary. The record is replete with evidence that Feagan and Mullen investigated the complaint, including evidence from both men's depositions as well as that of Bradford and James McDuff (all of whose depositions were submitted by ACT). Furthermore, Plaintiff admitted that Feagan and Mullen conducted an investigation in an interrogatory dated March 13, 2000. Plaintiff's only support for its patently false statement of fact is two depositions of their own employees who simply stated that they had *no knowledge* of any investigation conducted by SWB. This type of blatant distortion of the record by the Plaintiff is noticed and not appreciated by the Court.

**4.** Plaintiff disputes that it dug anywhere near the AT & T easement. However, Plaintiff has not presented any evidence that disputes that Feagan *believed* that their digging was too close to the easement, or that he reported the same to Bradford.

(1) the existence of a contract or valid business expectancy; (2) the defendant's knowledge of the contract or expectancy; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification for the interference; and (5) damages. *Fabricor, Inc., v. E.I. DuPont De Nemours & Co.*, 24 S.W.3d 82, 93 (Mo.Ct.App.2000). In order to sustain its burden the plaintiff must provide substantial evidence for each element of its prima facie case. *Id.* In the present case, the Court takes no position at this time as to whether Plaintiff has sustained its burden of demonstrating substantial evidence of elements (1), (2), and (5). However, the Court does find that Plaintiff has failed to demonstrate that a material issue of fact remains as to whether it has set forth substantial evidence of elements (3) and (4). Plaintiff has wholly failed to support these elements of its prima facie case with competent and/or admissible evidence.

### A. The Cancellation Was Not Caused by the Intentional Interference of AT & T

██ As to the third element, Plaintiff is required to show that AT & T intentionally caused the contract between SWB and ACT to be canceled. With regard to intent, the Plaintiff must prove that Defendant intended to cause SWB to cancel the contract. *See Francisco v. Kansas City Star Co.*, 629 S.W.2d 524, 530 (Mo.Ct.App.1981). With regard to causation, Missouri law applies a "but for" test. *Tri–Continental Leasing Co. v. Neidhardt*, 540 S.W.2d 210, 216 (Mo.Ct.App.1976). Within this but for approach the Plaintiff must prove that (1) the Defendant actively and affirmatively took steps to induce the cancellation of the contracts, and (2) the contracts would have been performed absent the Defendant's interference. *Id.* It is clear from the record that Plaintiff has failed to prove that Defendant had the intent, or indeed caused SWB to cancel its contracts with ACT.

### 1. Intent

██ First, Plaintiff has failed to submit substantial evidence of any intent on the part of AT & T to have the contracts in question canceled. Plaintiff merely submits evidence that Brooks was angry when he discovered that ACT had begun work without his presence. From that evidence Plaintiff asks the trier of fact to infer that AT & T had an intent to interfere with the contractual relationship between ACT and SWB. While such an inference based on circumstantial evidence is at times acceptable, the inference must be a reasonable one. *See Kerr Const. Paving Co., Inc., v. Khazin*, 961 S.W.2d 75, 79 (Mo.Ct.App. 1997). Put plainly, Plaintiff fails to present any evidence, let alone substantial evidence, that AT & T had any motive, intent, or reason to want to interfere with the contract between AT & T and ACT. Furthermore, Plaintiff presents no competent evidence that AT & T ever requested that the contracts be canceled. The record to date only shows that AT & T notified SWB of its near miss report. Accordingly, the record simply does not support an inference that Brooks or anyone else at AT & T intended to induce SWB into canceling its contracts with ACT.

### 2. Causation

██ Even assuming that there was an intent by Brooks to sabotage the contract between Plaintiff and SWB, Plaintiff fails to show that a material issue of fact exists as to causation. In fact, the record to date indicates a lack of causation between the actions taken by AT & T and the actions taken by SWB. The record reveals that Brooks filed an internal near miss report with AT & T and that some official at AT & T contacted SWB and communicated that such a report had been filed. At this point it is undisputed that SWB launched an independent internal investigation of

the work site operated by ACT. It was based on this internal investigation by Feagan and Mullen that SWB determined that termination of the contracts was proper. Feagan, a SWB field investigator, specifically testified that he was unaware that AT & T levied a grievance with SWB. He only knew that a complaint had been filed and that he was to investigate the site. The results of his investigation revealed two potential problems: (1) leaving lead sheathing in the ground; and (2) digging "close" to the AT & T easement. Feagan reported these independent findings to SWB headquarters and officials therein determined that termination of the contracts was warranted.

Therefore, even if Brooks had an intent to interfere with ACT's contractual relationship with SWB, the record is clear that he did not cause the demise of the relationship. Rather, the cancellation of the contract was based upon SWB's internal investigation. Indeed, McDuff, the person who had the authority to cancel the contracts, testified that SWB would never cancel a contract with one its contractors based solely on a complaint registered by an outside entity. SWB based its decisions concerning contractors on investigations conducted by SWB personnel. This testimony was also corroborated by SWB employee Bradford. AT & T's complaint to SWB may have precipitated SWB's investigation and ultimate termination of its business relationship with ACT, but the complaint cannot rightfully said to be the cause of the termination. The cause of the termination was clearly the SWB investigation.

### B. Justification

■ Assuming, *arguendo*, that a material issue of fact remains as to whether Defendant intentionally caused SWB to cancel ACT's contracts, the Plaintiff has still failed to present substantial evidence that AT & T lacked justification for taking the action that it did. Thus, it has failed to satisfy its burden as to the fourth element of the prima facie case. If the Defendant has a legitimate financial or business interest in the contracts in question, the Plaintiff must prove that Defendant engaged in improper means to protect its legitimate business interests. *Fabricor,* 24 S.W.3d at 95. Improper means can include things such as misrepresentation of fact. *Id.* It does not however, include negligence on the part of the Defendant. *Baldwin Properties, Inc. v. Sharp,* 949 S.W.2d 952, 957 (Mo.Ct.App.1997).

In this case, the only action that ACT charges AT & T with is falsely accusing ACT of committing a near miss and reporting this accusation to SWB. AT & T fully admits that Brooks filed an internal near miss report. These types of reports are primarily generated for the purpose of protecting AT & T's very valuable fiber-optic cables. It is the job of Brooks, as a field technician, to protect these cables from damage. As a part of this protection, Brooks is given the discretion to file a near miss report whenever his judgment leads him to believe that a fiber-optic cable was almost damaged, even if the possibility was remote. According to Plaintiff's expert, Peter Keating, a field technician would be well within his discretion to file a near miss report based on several unchallenged observations Brooks made such as: (1) the ACT crew had some inexperienced members working near live AT & T cable; (2) ACT did not expose the area where the two cables crossed so as to determine the danger to the intersection point; (3) ACT did not properly mark and locate the AT & T cable; and (4) Brooks was not present during the extraction so as to supervise the procedure and prevent damage. Any one of these events is sufficient cause for a cautious field technician to file a near miss report.

Plaintiff's only hope of refuting this evidence is with the supposed expert report of John C. Hoskins. While Hoskins' testimony is of questionable admissibility (indeed the Defendant has filed a separate motion to exclude his testimony), even assuming that the opinions are admissible, they do not contradict the justifications for Brooks filing his report.[5] Hoskins opines that ACT did not commit a near miss as he understands the term. That is, he states that ACT never actually dug near the AT & T cable so there was not any near miss to the cable. Even assuming this to be true and assuming Hoskins' opinion to have merit, he does not dispute the broader definition of near miss utilized by AT & T, which in this case includes the procedures ACT employed during the extraction. In the judgment of Brooks, ACT engaged in activities which put an AT & T fiber-optic cable at some degree of risk. The record is undisputed that this constitutes a near miss giving Brooks the discretion to file a report.

It was also within the discretion of AT & T, within the bounds of their near miss program, to notify the entity responsible for the near miss. In this case, AT & T notified SWB that one of its contractors engaged in activities which AT & T believed placed its cable at risk. Because the purpose of the near miss program was to prevent damage to its cable, it would make sense that AT & T would wish to inform those responsible for the potentially damaging conduct so that they might modify their actions. This position is fully explained by Defendant's expert Keating. Accordingly, Plaintiff has failed to demonstrate a lack of justification for the action which Defendant took.

**CONCLUSION**

Based on the foregoing, the Court finds that Plaintiff has failed to demonstrate that a genuine issue of a material fact exists as to all facets of its prima facie case. The record is clear that Plaintiff has failed to support its case with substantial evidence. Accordingly, the Court hereby GRANTS Defendant's Motion for Summary Judgment. Plaintiff's case is DISMISSED with prejudice to future actions.

**IT IS SO ORDERED.**

---

**5.** Furthermore, the Plaintiff does not even submit Hoskins' report as part of the record. Conversely, Defendant submits the expert report of Peter Keating. Thus, Keating's opinions are unopposed for purposes of this motion. Even if they were submitted, they would not contradict those offered by Defendant's expert.