**BALDWIN PROPERTIES, INC.,**
a Missouri Corporation,
Appellant,

v.

**Frank W. SHARP, Jr., P.E.,**
et al., Respondents.

No. WD 53529.

Missouri Court of Appeals,
Western District.

Aug. 19, 1997.

Michael Patrick Keleher, Gladstone, for Appellant.

John B. Reddoch, Liberty, for Respondents.

Before ELLIS, P.J., and LOWENSTEIN and HOWARD, JJ.

HOWARD, Judge.

Plaintiff Baldwin Properties, Inc. ("Baldwin") appeals from an order by the Circuit Court of Clay County, Missouri, granting summary judgment to Defendant Frank W. Sharp, Jr. ("Sharp"). Baldwin is in the business of building homes. In July, 1993, Sharp, a licensed Professional Engineer, inspected one of Baldwin's newly-built homes for Judy and Rande Kessler (the "Kesslers"). The Kesslers had been negotiating with Baldwin to purchase the home. Sharp found what he believed to be significant leakage problems in the basement, and informed the Kesslers that he estimated the repair cost to be at least $11,500. As a result of Sharp's inspection report, the Kesslers withdrew from further negotiations with Baldwin. Baldwin later filed suit against Sharp for tortious interference with a business relationship. Sharp filed a motion for summary judgment, and the trial court granted the motion for the specific reason that there existed no material dispute of facts regarding one element of Baldwin's cause of action—that Sharp lacked justification in issuing the inspection report.

On appeal, Baldwin contends that the trial court erred in granting Sharp's motion for summary judgment because (1) there was significant evidence before the court to show that Sharp lacked justification for his actions, and (2) the issue of justification is best left for determination by a jury.

Affirmed.

## Standard of Review

When considering an appeal from summary judgment, we review the record in the light most favorable to the party against whom judgment was entered, and we accord the non-movant all reasonable inferences therefrom. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo.1993). Our review is essentially de novo. *Id.*

A movant is entitled to summary judgment upon a showing that no genuine issues of material fact exist, and that judgment should be granted as a matter of law. *Id.* at 377. A defendant may establish a right to judgment as a matter of law by: "(1) negating an essential element of the plaintiff's claim; (2) establishing all the elements of an affirmative defense; or (3) showing that after an adequate period of discovery the plaintiff has not produced, and will not be able to produce, evidence sufficient to allow the trier of fact to find any one of the elements of the claim." *O'Brien v. Mansfield*, 941 S.W.2d 582, 585 (Mo.App. W.D.1997) (citing *ITT*, 854 S.W.2d at 381).

## Facts

In July, 1993, the Kesslers lived in Alabama, but were looking for a home in Kansas City because Mr. Kessler had been transferred to the Kansas City area. They engaged a real estate agent, T.J. Lamb, to serve as their agent in locating and purchasing a home. Lamb showed them the house built by Baldwin that is the subject of this litigation. The Kesslers inspected the house with Lamb and found a thin layer of pooled water in the basement. The Kesslers expressed some interest in the house, so Lamb advised them to make an offer contingent upon a favorable engineer's report. They did so, and Lamb then contacted Sharp and asked him to inspect the property. Sharp agreed to conduct the inspection for $250.00. Sharp inspected the property on July 23, 1993, in the presence of Lamb. Lamb informed Sharp that the Kesslers were primarily concerned about the water in the basement because they wanted to finish the basement for additional living space. Sharp, therefore, began by inspecting the basement to determine the severity of the leakage problem. He told Lamb that he felt the problem was serious and would cost at least $11,500 to fix. Assuming that the Kesslers would no longer want the house, Lamb and Sharp decided to terminate the inspection early, and Sharp reduced his fee to $150.00. In a letter to Mr. Kessler dated July 28, 1993, Sharp recounted his findings:

On July 23, 1993, I met Buyer's Agent, T.J. Lamb at the 2406 NE 79th Street Location. The new residence is nearly complete, save the landscape grading and some appliance installation. I was to perform a modified Whole House pre-purchase inspection on your behalf which

includes observations and Professional Engineer opinions of mechanical and structural systems. I am writing at this time to give you my formal opinion and observation. I elected to terminate the work after completion of the foundation structural inspection phase.

I found the fully enclosed reinforced concrete basement foundation to be abnormally and unacceptably wet on the interior surfaces, water intruding at the floor-to-wall cove joint, and the basement floor to be unacceptably wet throughout. Mildew and water were present on the small finished portion of the stairwell in the basement. Even considering the incomplete landscaped nature of the point of construction, I cannot recommend accepting a foundation/basement with these indicated problem areas for future owners. In general, the native clay soils around and under the foundation are saturated and will adversely effect the structure of this residence.

In the daily conduct of our Professional Engineering practice we see the results of this wet clay interaction with foundations of all types. We are often called upon to advise distressed homeowners on how to address such problems. We foresee at least $11,500 of immediate remedial work to begin to cope with just the general wet condition of the surrounding and supporting soils. With the passage of time, other root cause related structural settlement and cracking may emerge in this foundation which will require additional major maintenance investments on your part.

Following the inspection, Lamb immediately notified the Kesslers of Sharp's findings, and the Kesslers told him that they no longer wanted the house. Lamb then notified Baldwin that the Kesslers were withdrawing their offer.

When Baldwin found out about Sharp's opinion, it hired a different professional engineer, Willard Norton, to inspect the property. Norton inspected the property on July 30, 1993. That same day he sent a letter to Baldwin discussing his opinion. He wrote the following:

Examination of the basement area showed that, because of poor drainage around the foundation during its construction, water has built up around the outside of the basement area and has not drained away through the two means of drainage that you have developed. It can be assumed that this system is not effective in removing water from the base of the foundation. This is manifested by free water on the floor and dampness on the face of the concrete foundation up approximately one foot from the floor slab.

Since it is obvious that the drain tile exits are not functioning as expected, it, first behooves you to dig down at the southeast corner and check the T connection that allows the drain tile to drain to light. If this connection is not satisfactory, I recommend that you make the connection and flood the foundation with a root feeder at the west side of the concrete patio. This flooding should continue until water flows from the drain tile. It, obviously, will flow in that direction because, apparently, the connection to the gravel sewer line is not functioning.

If, after a few hours of flooding, water does not come out of the drain tile, I recommend that the T connection be opened for probing with a garden hose along the two sides from the corner. If blockage is found, the choice then becomes whether to continue to try to induce drainage through the existing system or to create a dry well and a sump pump to be installed as described. However, I find it hard to believe that your exposing the T and flooding will not cause a satisfactory drainage of the outside of your foundation. . . .

Apparently, the remedy prescribed by Norton worked, and cost only a minimal amount of money—much less than Sharp's $11,500 estimate. Baldwin hired another professional engineer, Carl Martin, to inspect the property again in May, 1995. Martin concluded that there was no leakage problem and that the basement had been dry for at least a year.

Baldwin ended up selling the home in February, 1994, to another couple for an amount roughly $15,000 less than the amount last offered by the Kesslers. In May, 1995, Bald-

win filed a petition with a claim against the Kesslers for breach of contract, and a claim against Sharp for tortious interference with a business relationship. Later, Baldwin conceded that no contract with the Kesslers ever existed, and dismissed them out of the lawsuit. The suit against Sharp continued. After several months of discovery, Sharp filed a motion for summary judgment, which the trial court granted. This appeal follows.

## Tortious Interference with a Business Expectancy

■ In Missouri, to establish a claim for tortious interference with a contract or business expectancy, a plaintiff must prove the following: (1) the existence of a contract or a valid business relationship; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages. *Community Title Co. v. Roosevelt Federal Sav. and Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. banc 1990); *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 316 (Mo. banc 1993).

■ Of the five elements listed above, the fourth—absence of justification—is primarily at issue. A plaintiff has the burden of producing substantial evidence to establish an absence of justification. *Nazeri*, 860 S.W.2d at 316, 317. "Absence of justification is the absence of any legal right on the part of the defendant to take the actions about which a plaintiff complains." *SSM Health Care, Inc. v. Deen*, 890 S.W.2d 343, 346 (Mo.App. E.D. 1994).

Thus, the issue before us is whether Baldwin has produced sufficient evidence to create a genuine issue of material fact as to whether Sharp's actions lacked justification. Baldwin refers us to sworn affidavits from the two engineers that it hired, Willard Norton and Carl Martin, as well as to Sharp's deposition testimony, as proof that Sharp lacked justification in issuing his report. It claims that the affidavits and deposition contain evidence of the following, which for purposes of this appeal, we will assume to be true:

(1) that Sharp incorrectly diagnosed the cause of the water-leakage problem in the basement, and drastically overstated the cost to repair the leakage;

(2) that Sharp formed his opinion with knowledge of the following: that the soil on the property was saturated with water from abnormal rainfall; that there were puddles of standing water in the backyard; that the lot lacked guttering and had not yet been landscaped or graded; and that a lack of guttering and final grading could contribute to a build-up of hydrostatic pressure around a home;

(3) that Sharp failed to determine whether an exterior footing drain existed;

(4) that Sharp reported to the Kesslers that the clay soil around the foundation would adversely affect the structure of the residence, without performing any soil testing on the property;

(5) that Willard Norton was able to remedy the problem at a cost much less expensive than Sharp's estimate by simply locating the exterior footing drain and flooding it with a root feeder to flush out excessive dirt which had built up in it; and

(6) that, according to Carl Martin, "to recommend remedial work on a property before even ascertaining whether an exterior footing drain existed and the reasons why it was malfunctioning would be unprofessional, negligent and would not exhibit the level of care from a licensed professional engineer."

## Absence of Justification

■ Again, our primary concern is whether Baldwin produced evidence that Sharp lacked justification. Typically, the issue of justification arises in situations in which the defendant has a legitimate economic interest to protect. In these situations, the defendant is said to be justified in interfering with another's business expectancy for the purpose of protecting his own economic interest, so long as he does not employ improper means. *Nazeri*, 860 S.W.2d at 317; *Community Title*, 796 S.W.2d at 372. "Improper means" are those means that are "indepen-

dently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Nazeri*, 860 S.W.2d at 317.

■ One does not, however, necessarily need to have an economic interest at stake in order to be justified in interfering with a contract or business expectancy. Justification also exists if a person has an "unqualified legal right to do the action of which the petition complains." *Macke Laundry Service Ltd. Partnership v. Jetz Service Co., Inc.*, 931 S.W.2d 166, 181 (Mo.App. W.D. 1996). Again, the qualification is that "improper means" are not used.

Our analysis begins by determining whether Sharp had a legal right to inspect the house and submit an opinion regarding its condition. The Kesslers, through their agent, specifically sought out and hired Sharp for his professional services. Basically, the Kesslers were seeking advice. They wanted a professional opinion on the severity of the leakage problem in the basement. Therefore, Sharp had the right to inspect the house and report his opinion to the Kesslers.

■ Baldwin does not argue that Sharp had no right to perform the inspection. Rather, Baldwin argues that Sharp was not justified in the manner in which he performed the inspection. This is where the "improper means" test comes to play. In other words, the question is whether Sharp used means that were "independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Nazeri*, 860 S.W.2d at 317.

■ We find no evidence that Sharp used "improper means." The only evidence Baldwin presents is that Sharp's inspection did not comply with the level of care of a licensed, professional engineer, and that Sharp should have conducted a more thorough inspection before forming an opinion that the leakage problem would be expensive to correct. Baldwin uses a lot of colorful words in its brief to describe Sharp's actions. However, the evidence really proves nothing in regard to improper means; it would be relevant only to a claim that Sharp may have been negligent. Negligent acts are not "improper means" for purposes of this test. To hold otherwise would be to find that a person's negligent actions could subject that person to liability to a third party for an intentional tort.

■ Baldwin attempts to get around this by arguing that Sharp's letter contained misrepresentations of fact. This argument fails, however, because Sharp indicated several times in the letter that he was reporting his opinion. Therefore, he made statements of opinion, not representations of fact.

■ As a final argument, Baldwin claims that the element of justification is a factual question that is best left for a jury to determine. We address this argument first by noting that this court has affirmed summary judgments in numerous cases in which justification was the primary issue. *See, e.g., Macke*, 931 S.W.2d 166; *Hamilton v. Spencer*, 929 S.W.2d 762 (Mo.App. W.D.1996); and *Xavier v. Bumbarner & Hubbell Anesthesiologists*, 923 S.W.2d 428 (Mo.App. W.D.1996). Therefore, just because justification is an issue does not mean a case has to go to a jury.

Second, Baldwin has presented no legitimate theories or explanations as to how Sharp's actions were anything other than negligent, or as to why Sharp would even want to resort to improper means. Baldwin's only attempt at an explanation was this: "[Sharp] employed improper means in order to further his improper purpose which was to gain money for an inspection he did not perform competently, completely, or in an unbiased manner." This makes no sense, considering that Sharp actually charged *less* money for the inspection than he originally planned because he cut the inspection short.

## Conclusion

In its cause of action against Sharp for tortious interference with a business expec-

tancy, Baldwin failed to produce any evidence that would create a genuine issue of material fact as to one element—absence of justification. Specifically, we find no evidence that Sharp used "improper means."

Therefore, we affirm the trial court's order granting summary judgment to Sharp.

All concur.