# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2468

_____

| | | |
|---|---|---|
| Deutsche Financial Services Corporation, a Nevada Corporation, | * * * * | |
| Appellant, | * * | |
| v. | * * * | Appeal from the United States District Court for the Eastern District of Missouri. |
| BCS Insurance Company, an Ohio Corporation; National Administration Solutions, Inc.; Loss Control Specialists; Haytham ElZayn, an individual; Risk Consultants and Actuaries, Ltd, | * * * * * * * | |
| Appellees. | * | |

_____

Submitted: December 12, 2001

Filed: August 5, 2002

_____

Before MORRIS SHEPPARD ARNOLD, BEAM, and RILEY, Circuit Judges.

_____

BEAM, Circuit Judge.

Deutsche Financial Services Corporation ("Deutsche") appeals from the district court's[1] order granting summary judgment in favor of BCS Insurance Company ("BCS"), National Administration Solutions, Inc. ("NAS"), Loss Control Specialists ("Loss Control"), Risk Consultants and Actuaries, Ltd. ("RCA"), and Haytham ElZayn, on Deutsche's claims of tortious interference with a contract and business relationship, and civil conspiracy. Deutsche also appeals from the district court's denial of its motion to file a second amended complaint. For the reasons that follow, we affirm.

## I.    BACKGROUND

Deutsche sells extended service contracts to purchasers of consumer goods. Beginning in April of 1987, Deutsche subcontracted with Insurance Specialists, Inc. ("ISI")[2] to serve as its third-party administrator for the service contracts. In that capacity, ISI determined whether requested repairs were covered by the Deutsche service contracts. In addition, ISI was obligated to procure insurance coverage for Deutsche's obligations under the service contracts. Initially, ISI placed insurance coverage for the service contracts with American Hardware Mutual Insurance Company. On May 15, 1993, Deutsche and ISI entered into a renewed Service Agreement. By its terms, ISI was prohibited from assigning or modifying the Service Agreement without written approval from Deutsche.

On June 4, 1992, BCS entered into a Management Agreement with ISI. Under the Management Agreement, BCS agreed to insure service contracts sold, marketed and administered by ISI. ISI agreed to act as BCS's administrator and adjudicate claims to determine whether they were valid under the applicable insurance policies.

---

[1]The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

[2]ISI is not a party in this litigation.

The Management Agreement provided that it could be terminated by either party upon ninety days written notice prior to the renewal date of December 31, 1997.

As a result of the Management Agreement, ISI procured BCS to replace American Hardware as Deutsche's insurer. BCS and Deutsche entered into an Insurance Agreement on November 1, 1992, which covered the costs of valid claims made by consumers under the service contracts issued by Deutsche.

To cover the liability associated with insuring Deutsche, BCS reinsured the service contract risk with certain Lloyd's of London syndicates ("Lloyds").[3] Under the reinsurance agreements, ISI was the initial claims administrator and Lloyd's reserved the right to audit ISI's performance and remove ISI as administrator if necessary. Beginning in early 1997, Lloyd's hired Haytham ElZayn (first through his employer, Mercer, and then through his own company, RCA) to conduct claims audits on ISI. Unsatisfied with the results of the audits, on September 25, 1997, BCS sent ISI timely written notice of its intent to terminate the Management Agreement. On December 30, 1997, BCS extended the Management Agreement by one month, which pushed the date of termination to January 31, 1998. ISI continued to administer claims after January 31, 1998, while the parties worked on negotiating a new agreement. Lloyds and BCS, however, remained dissatisfied with ISI's claims administration and on June 12, 1998, BCS directed ISI to transfer the service contracts to a new claims administrator, Loss Control, which is owned by ElZayn's wife, and is a division of RCA.[4]

---

[3]Lloyds is not a party in this litigation.

[4]Initially, BCS planned on transferring the service contracts to another ElZayn company, NAS. At ISI's request, however, BCS transferred the contracts to Loss Control because NAS was in competition with ISI in the service contract business.

Deutsche claims that when BCS required ISI to transfer the service contracts to Loss Control, it tortiously interfered with the contractual and business relationship between Deutsche and ISI. Specifically, Deutsche alleges that the required transfer of the service contracts interfered with the 1993 Service Agreement between Deutsche and ISI, which prohibited ISI from assigning the Service Agreement without written approval from Deutsche. Deutsche claims that the assignment of the service contracts to Loss Control caused damage to its business because certain agents and dealers who market Deutsche's service contracts were dissatisfied with Loss Control's administration of claim repairs, which resulted in the disruption of Deutsche's marketing of service contracts. Deutsche also claims that ElZayn and RCA tortiously interfered with the ISI-Deutsche relationship. Finally, Deutsche claims that BCS, ElZayn, RCA, Loss Control, and NAS conspired to interfere with the Deutsche-ISI contract and business relationship.

## II. DISCUSSION

Deutsche contends that genuine issues of material fact preclude the entry of summary judgment and that the appellees are not entitled to judgment as a matter of law. We review the district court's grant of summary judgment de novo, viewing the facts in a light most favorable to the nonmoving party. We will affirm only if there are no genuine issues of material fact in the record and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Pony Computer, Inc. v. Equus Computer Sys. of Missouri, Inc., 162 F.3d 991, 997 (8th Cir. 1998).

### A. Tortious Interference Claim Against BCS

Under Missouri law, a claim for tortious interference with a contract or business expectancy requires proof of each of the following: (1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing breach of the contract

or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct. Community Title Co. v. Roosevelt Federal Sav. and Loan, 796 S.W.2d 369, 372 (Mo. 1990). The plaintiff has the burden of "producing substantial evidence to establish the absence of justification." Id. Furthermore, "[o]ne who has a present existing economic interest, such as a prior contract of his own or a financial interest in the affairs of the person persuaded not to enter into a contract, is privileged to interfere with another's business expectancy to protect one's own economic interest." Id. In sum, "[n]o liability arises for interfering with a contract or business expectancy if the action complained of was an act which the defendant had a definite legal right to do without any qualification." Id.

This case turns on whether BCS had a legal right to terminate its relationship with ISI. The district court held that BCS did have a legal right to terminate ISI and transfer the service contracts under the express terms of their Management Agreement. The Management Agreement expressly permitted BCS to terminate ISI upon ninety days written notice, which it did. BCS provided timely notice of termination and then transferred the service contracts from ISI to Loss Control. This fact devastates Deutsche's claim. If BCS had a "definite legal right" to terminate ISI and transfer the service contracts, then no liability arises for BCS interfering with the ISI-Deutsche relationship. Id. Perhaps recognizing the power of this argument, in its brief Deutsche embarks on a lengthy attempt to demonstrate that BCS did not *really* terminate the Management Agreement. However, the record reflects that BCS sent multiple letters to ISI terminating the agreement and ISI concedes as much.

Deutsche argues that although BCS sent ISI timely notice of termination, we should impose an implied contract between BCS and ISI as a result of their conduct towards one another. Presumably, if an implied contract remained in force between BCS and ISI, the transfer of the service contracts would be a breach of the "implied" Management Agreement, and BCS would lose its shield of unqualified legal right. Deutsche claims that an implied contract existed between BCS and ISI because after

the termination date of the Management Agreement and the transfer of the service accounts, ISI continued to administer other service contracts for BCS. However, the record reflects that BCS and ISI both believed that the Management Agreement was terminated and that BCS had the right to transfer the service contracts. ISI's chief financial officer, Mark Lewis, testified that it was the position of ISI that BCS had the right to transfer the service contracts. As the district court explained, "both ISI and BCS believed that BCS had the right to transfer the service contracts from ISI. The parties' beliefs as to their rights and obligations under an agreement are always relevant." Joint App. at 1285, n.7. Deutsche does not claim to be a third-party beneficiary to the Management Agreement and conceded in its brief that it is "not seeking relief for BCS' breach of the BCS-ISI management agreement." In this context, we decline the invitation to impose an implied contract when both BCS and ISI believe that the contract expired.

In addition, Deutsche's argument that an implied contract existed between BCS and ISI is clearly wrong, as a matter of law. In fact, two of the cases cited by Deutsche in its brief for its theory of implied contract actually offer strong support for the appellees' position that there was no implied agreement. In <u>Consolidated Bearings Co. v. Ehret-Krohn Corp.</u>, 913 F.2d 1224, 1230 (7th Cir. 1990), the court held that a contract does not renew "simply because the parties continued to do business governed by its terms." In that case, an importer and distributor continued to do business after one party sent timely notice to the other terminating the contract. After negotiations for renewing the contract failed, the party that initially provided timely notice of termination sent another letter terminating the contract, which was not timely. The plaintiff argued that the first notice was negated by the fact that the parties continued to do business with one another and that the second notice was untimely. The court rejected that argument, reasoning that the plaintiff actually received more notice, not less, than the contract required. <u>Id.</u> The court reasoned that while a presumption arises that a contract is renewed when an employee continues working under a contract after its expiration, "evidence that the parties were

negotiating a new contract rebuts the presumption by negating the inference that either party believed the contract had been renewed." Id. Likewise, the record here demonstrates that BCS and ISI were negotiating contract renewal before and after the effective date of expiration. Furthermore, ISI received more notice, not less, than the contract required because it was given a series of timely notices regarding BCS's intentions about the Management Agreement.

Deutsche also cites Luden's Inc. v. Local Union No. 6, 28 F.3d 347 (3d Cir. 1994), for its implied contract theory. However, once again, this case plainly supports BCS's position. Luden's explained that:

> [G]eneral principles of contract law teach us that when a contract lapses but the parties to the contract continue to act as if they are performing under a contract, the material terms of the prior contract will survive intact *unless either one of the parties clearly and manifestly indicates, through words or through conduct, that it no longer wishes to continue to be bound*.

Id. at 355-56 (emphasis added). Here, BCS clearly and manifestly indicated through its notice of termination letter that it no longer wished to be bound by the Management Agreement. Thus, no implied contract existed and BCS had a legal right to transfer the service contracts to Loss Control.

Deutsche further argues that BCS did not have the power to change administrators under the Deutsche-BCS Insurance Agreement. However, nothing in Deutsche's brief answers the well-reasoned opinion of the district court on this issue:

> [T]he [Insurance Agreement] refers to the insurance company's "authorized Administrator." It is obvious that this refers to whoever BCS authorizes to be its administrator and to adjudicate claims. There is nothing in the Insurance [Agreement] which states that BCS's authorized administrator had to be ISI. There are no provisions

prohibiting BCS from choosing another Administrator, or requiring BCS to get [Deutsche's] approval. The language of the Insurance [Agreement] does not prohibit BCS from exercising its right under its Management Agreement with ISI to transfer the contracts to another Administrator.

Joint App. at 1289.

Finally, Deutsche argues that even if BCS was justified in terminating ISI's administration of the service contracts, it used improper means in effecting the transfer because it threatened to stop paying claims if ISI did not transfer the administration of the service contracts to Loss Control. Under Missouri law, use of improper means eliminates the argument that a defendant was justified in interfering. Community Title, 796 S.W.2d at 372 ("It is not justification to knowingly procure the breach of a contract where the defendant acts with an improper purpose and seeks not only to further his own interest, but in doing so employs improper means."). Improper means are defined as those "that are independently wrongful, such as threats, violence, trespass, defamation . . . or any other wrongful act recognized by statute or the common law." Nazeri v. Missouri Valley Coll., 860 S.W.2d 303, 317 (Mo. 1993). BCS did not employ improper means. When BCS communicated that it would not pay claims submitted to ISI, the Management Agreement between BCS and ISI was no longer in force. Therefore, ISI was not BCS's authorized administrator and BCS was not required to pay on claims submitted to ISI. BCS's communication that it would not pay on claims was not "independently wrongful," id., it was factually and legally accurate. Deutsche did not cite, and we did not uncover, any Missouri law to support the proposition that a "threat" to do what one has a legal right to do constitutes improper means for the purpose of a tortious interference claim.

In sum, there are no material facts in dispute that if resolved in Deutsche's favor would result in liability for BCS. When BCS transferred the service contracts

-8-

from ISI it had an existing economic interest in its own contract with ISI, and therefore was "privileged to interfere with another's business expectancy to protect [its] own economic interest." Community Title, 796 S.W. 2d at 372. Deutsche did not come forward with substantial evidence demonstrating BCS's absence of justification for interfering with Deutsche's business expectancy with ISI. BCS believed it was losing money as a result of its relationship with ISI and had a definite legal right, without qualification, to terminate its Management Agreement with ISI and transfer the service contracts. Furthermore, BCS had the right to choose its authorized administrator under the BCS-Deutsche Insurance Agreement.

## B.     Tortious Interference Claim Against ElZayn and RCA

Deutsche argues that the district court erred in granting summary judgment on its tortious interference claim against ElZayn and RCA because there is a factual dispute concerning whether ElZayn, and his company, RCA, used improper means to convince BCS and Lloyds to replace ISI with his wife's company, Loss Control. At the direction of BCS's reinsurer, Lloyds, ElZayn performed an audit of ISI's claims management and reported that ISI was overpaying claims by forty percent. Deutsche claims that this figure was not accurate. In addition, Deutsche claims that ElZayn failed to supply Lloyds with a copy of an ISI "action plan" that was designed to improve its audit performance. ElZayn's conduct, according to Deutsche, raises a jury question as to whether ElZayn and RCA tortiously interfered with the Deutsche-ISI business relationship.

ElZayn and RCA are not liable for tortious interference if their conduct was justified, via an unqualified legal right. Community Title, 796 S.W.2d at 372. Under Missouri law, performing a contractual duty provides a sufficient justification for interference. For example, in Baldwin Properties, Inc. v. Sharp, 949 S.W.2d 952, 955-56 (Mo. Ct. App. 1997), a home seller sued an engineer for tortious interference with a business expectancy, alleging that the engineer's incorrect inspection report

caused the seller to lose the sale. In affirming summary judgment for the engineer, the court identified the general rule that the engineer had an unqualified legal right to perform the inspection, as long as improper means were not used. Id. According to the Missouri Court of Appeals, the key was whether the engineer's actions were "independently wrongful." Id. at 956-57. The court held that the engineer's conduct, even if negligent, did not amount to "improper means." Id. at 956. "To hold otherwise would be to find that a person's negligent actions could subject that person to liability to a third party for an intentional tort." Id. at 957.

Like Baldwin Properties, Deutsche did not present evidence that ElZayn's audit was "independently wrongful." The only evidence that Deutsche presents to refute ElZayn's audit was a different audit conducted by RCA reporting that ISI was overpaying claims by approximately seventeen percent. There is a dispute, however, over whether the two audits were even of the same claim sample. That factual dispute is of no avail to Deutsche, because even if ElZayn's audit overstated the amount ISI overpaid, Deutsche has produced no evidence that such overstatement was intentional. The subsequent audit of ISI did not uncover any evidence that ElZayn employed improper means during his audit. In fact, the subsequent audit *verified* that ISI was overpaying claims. In sum, ElZayn had a legal right to audit ISI and submit his opinion to Lloyds, and Deutsche has not presented any evidence, much less substantial evidence, that ElZayn's audit was "independently wrongful."

Deutsche's argument that ElZayn should be held liable because he failed to inform Lloyds of ISI's plan to improve its audits is totally without merit. Deutsche presented zero evidence that the so-called "action plan" was ever acted upon. In fact, there is specific evidence to the contrary, as the district court explained: "ISI's former insurance manager . . . testified that ISI was highly resistant to recommendations regarding changes to the claim payment process and discouraged him from following through on additional audit and oversight of the internal operations of the claims department." Joint App. at 1291, n.13. In sum, there is simply no evidence that

-10-

ElZayn or RCA employed improper means while they were conducting business with Lloyds.

### C.    Civil Conspiracy Claim

Deutsche cannot prevail on its claim for civil conspiracy where the underlying tort claim fails.  Rice v. Hodapp, 919 S.W.2d 240, 245 (Mo. 1996).  Deutsche relied solely on the tortious interference claim as its predicate for civil conspiracy.  Because we find that appellees are not liable for tortious interference, Deutsche's civil conspiracy claim fails as well.

### D.    Motion to File a Second Amended Complaint

Deutsche claims that the district court erred in denying its motion for leave to file a second amended complaint.  Deutsche sought leave to amend so that it could add a new count alleging a violation of section 537.330 of the Missouri Revised Statutes, which governs malicious trespass.  Deutsche claims that one month prior to the filing of Deutsche's motion for leave to amend, the Missouri Court of Appeals rendered a decision applying the malicious trespass statute, for the first time, to damage inflicted upon intangible property.  Weicht v. Suburban Newspapers of Greater St. Louis, Inc., 32 S.W.3d 592 (Mo. Ct. App. 2000).  Deutsche claims that Weicht provided it with an additional avenue of recovery which was not previously recognized by Missouri courts.

We review a district court order denying leave to amend for an abuse of discretion.  Clemmons v. Delo, 177 F.3d 680, 686 (8th Cir. 1999).  Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely given when justice so requires," there is no absolute or automatic right to amend one's complaint.  Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 224 (8th Cir. 1994).  Permission to amend may be withheld if, among other things,

the amendment would prejudice the opposing party or create undue delay.  Id.  The district court found that both undue delay and prejudice would result if Deutsche was allowed to amend its complaint.  The district court based the denial on several facts: (1) almost a year had passed since the deadline for amending claims when Deutsche sought leave to amend; (2) extensive discovery had been conducted and had closed; and (3) dispositive motions had been filed and were pending before the court.  We have considered Deutsche's arguments and conclude that they are without merit.  Based on the district court's rationale, we do not think it abused its discretion in denying leave to amend a second time.

## III.  CONCLUSION

For the reasons stated, the order of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.