J-A09034-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MARK WEISS, M.D | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| THOMAS JEFFERSON UNIVERSITY | : | No. 3103 EDA 2017 |
| AND JEFFERSON UNIVERSITY | : | |
| PHYSICIANS | : | |

Appeal from the Order August 15, 2017
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  September Term, 2015 No. 02839

BEFORE:  KUNSELMAN, J., MURRAY, J., and PELLEGRINI*, J.

MEMORANDUM BY PELLEGRINI, J.:                  **FILED JUNE 17, 2019**

Mark Weiss, M.D. (Weiss) appeals from the order entered by the Court of Common Pleas of Philadelphia County (trial court) entering judgment against him in an action against the named Defendants, Thomas Jefferson University (TJU) and Jefferson University Physicians (JUP) (collectively, Jefferson), in which he claimed that there was an employment contract between him and Jefferson.  For the following reasons, we affirm.

**I.**

**A**.

TJU is an academic institution that includes the Jefferson Medical College (JMC), which is affiliated with the medical practice JUP.  Physicians who see

_____
*   Retired Senior Judge assigned to the Superior Court.

patients at JUP are required to hold a faculty position at JMC in one of its 26 departments.[1]

In 2008, JMC created the Hematological Malignancies & BMT Division (Division) within the Department of Medical Oncology (Department). Around March 2009, Dr. Neal Flomenberg (Flomenberg), the Department's Chair, approached Weiss, a well-known and highly respected physician, about leaving Memorial Sloan Kettering in New York City to serve as the director of the Division. After months of negotiation, on August 13, 2009, a proposed letter agreement (Agreement) was sent to Weiss on Jefferson Medical College stationary stating in its opening paragraph:

> We are pleased to formally offer you an appointment to the Department of Medical Oncology at Jefferson Medical College (JMC), a division of Thomas Jefferson University (the University or TJU) effective November 1, 2009. This letter (Agreement) sets forth the terms of your appointment and employment with TJU and Jefferson University Physicians (JUP).

(RR. 326a).

The Agreement provided that Weiss would be proposed as a Professor on a tenure track. The Agreement would be for a five-year term commencing November 16, 2009, and ending November 15, 2014. As to compensation, Weiss' total annual salary was to be $350,000 from two separate sources: an academic base salary of $250,000 and a clinical draw from JUP of $100,000.

---

[1] While all physicians at JUP are faculty members of JMC, it does not appear that all members of the JMC faculty treat patients at JUP.

Additionally, Weiss was supplied with $250,000 in discretionary funding for his division. Weiss could also receive up to $65,000 in incentives from JUP for clinical services that he provided. During the term of the Agreement, Weiss' compensation could also be increased at the start of each fiscal year via "salary letters" from the Dean.[2] Weiss' combined salary at the end of the Agreement was $356,850. (RR. 469a). By reference, the JMC By-Laws (By-Laws) were incorporated into the Agreement.

On August 13, 2009, Flomenberg and the Director of the Kimmel Cancer Center signed the Agreement. Above both their signatures was the preprinted word "RECOMMENDED." On August 28, 2009, Weiss signed the Agreement. On September 2, 2009, the JMC Dean, Mark Tykocinski (Dean) signed the Agreement above the preprinted word "APPROVED."

**B.**

Before a contract's end date, the Office of Decision Support (Decision Support), which is responsible for matters involving compensation and the process of approving contracts, determines whether to issue a renewal. Dr. Karen Novielli (Novielli), the Associate Provost for Faculty Affairs and

---

[2] Weiss' start date and end date were pushed back by 15 days. Other than changing the dates of Weiss' Agreement via a letter from Flomenberg, the salary letters are the only amendments made to the Agreement.

Professional Development[3] and the head of Decision Support, testified that multiple factors are considered when making a decision about renewal, including input from the department involved, budgetary considerations, and the rank and track of the professor.

On June 18, 2014, JMC sent Weiss a renewal contract stating, "We are pleased to offer you a renewal (also referred to herein as this contract) of your [JMC] faculty appointment and employment at [TJU] and [JUP] in the Department of Medical Oncology." (RR. 337a). The renewal contract was a three-year contract with annual compensation of $358,600, with an academic base salary of $253,000 and a JUP draw of $105,600. The renewal contract did not provide any discretionary expenditures for the Division.

Weiss did not accept the contract, instead counter-proposing a term of five years with a total salary of $400,000 and $100,000 in annual discretionary funds for use by his Division. This began a series of discussions concerning the terms of his renewal contract.

In July 2014, Weiss emailed Flomenberg and Andrew Curran (Curran), the Administrator of the Department of Medical Oncology, requesting a meeting to discuss salary, discretionary funds and his desire to renew for five

_____

[3] Novielli reports to the Dean of JMC and her office works with individual departments to issue contracts to faculty and is responsible for, *inter alia*, appointments and enforcing policies. Decision Support is responsible for matters involving compensation and the process of approval of initial and renewal contracts, including procuring the Dean's approval and signature.

years.  In response, Curran told Weiss to speak to Flomenberg and that he did not think the five-year term was likely to be approved.  In July, Weiss discussed the renewal contract with Flomenberg.  However, because Flomenberg's renewal contract was being negotiated at the same time, Flomenberg did not yet know what he would receive or what would be available to the Department for salary increases.  Both agreed that they would wait until Flomenberg's new contract was finalized before settling on Weiss' requests.

Weiss then requested that the Agreement be kept in place until its expiration on November 15, 2014.  Curran asked Decision Support's permission to do so, which agreed but reiterated that Weiss' original contract end date would still apply.  Weiss received a salary letter from the Dean confirming that the Agreement was valid until November 15, 2014.

In October 2014, Andrew Nasca (Nasca), a member of Decision Support's Risk Management, emailed Curran to ask his recommendations for Weiss' new contract.  Nasca stated that Jefferson wanted to issue Weiss a three-year contract effective July 1, 2014.[4]  In response, Curran proposed a four-year term, writing, "Rather than a shorter contract we would prefer an end date of 6/30/18."  (RR. 473a).  Nasca told Curran to speak to Novielli,

---

[4] Novielli explained that the fiscal year ran from July 1 through June 30.  The preference was to have contracts align with the fiscal year upon renewal.

who rejected the four-year proposal. Curran told Weiss about this communication and informed him that a term longer than three years was "going to be a major issue, major hurdle" to overcome. (RR. 194a-195a). Weiss responded by saying he still preferred the five years.

Throughout the fall and into the early winter of 2014, Flomenberg had discussions with Weiss regarding Weiss' proposed terms. Flomenberg concurred that Weiss' compensations "should be increased" and he "thought it was inappropriate that [Weiss] had done five years without a substantial increase" and "should get more." (RR. 148a; RR. 150a).

Meanwhile, the Agreement expired on November 15, 2014. Weiss continued to provide the same services at the same compensation he had been providing before that date while discussions continued. After Flomenberg's contract was renewed, Weiss requested on December 4, 2014, a "Word" version of the proposed Renewal Contract so that he could make it conform to the terms agreed to by Flomenberg, *i.e.*, a five-year term ending June 30, 2019, with an annual salary of $400,000, plus incentive payments and the provision of annual $100,000 discretionary funds. Weiss then forwarded the revised Renewal Contract to Curran. Flomenberg had no objection to those terms. (RR. 150a).

On December 29, 2014, Curran sent an email to the Decision Support group at Jefferson responsible for administering contracts, confirming that Flomenberg had "approved" the changes proposed by Dr. Weiss. The next

day, Novielli responded that the Dean and the Finance Department's Scott Ravenfeld (Ravenfeld) would have to review and approve Weiss' request for discretionary dollars and asked Curran to justify the other terms.

On January 9, 2015, Ravenfeld reported in an email to Novielli and other members of Decision Support that the Dean was "ok with the requested increase in Dr. Weiss' compensation ($400k + $50k Incentive = $450k, . . .)." (RR. 470a-471a). That email also stated that the Dean "agrees with Karen [Novielli] that it should be 3 years not 5. We typically only give 5-year renewals to Chairs." As to the salary, Ravenfeld wanted "the attorneys to weigh in." *Id.*

In an email to Weiss dated February 10, 2015, Curran said that he did not "have a contract to share" but:

> "... I have be[en] given the go ahead for your new comp. Not sure if I will catch [Flomenberg] for signature today, but I will submit the documents with the retro start date to 11/1. Contract to follow shortly."

(RR. 470a). The email did not mention anything about a contractual length or discretionary allowance. Curran's email attached another email describing administrative paperwork that needed to be submitted. There is no dispute that Weiss was unaware of the internal correspondence regarding his contract other than what Curran told him.

**C.**

While the renewal contract was undergoing administrative review, a member of the TJU Board of Trustees was admitted to TJU for treatment of

multiple serious ailments. Weiss, as the institution's recognized expert in the treatment of the patient's illnesses, was called upon to recommend treatment. Weiss refused to implement the more aggressive treatment suggested by the patient and his personal physician, believing that the patient would not survive that regimen. On March 3, 2015, the patient chose to leave TJU to seek more aggressive treatment at another hospital.

That evening, Flomenberg wrote in an email to Weiss saying "I am extremely unhappy and embarrassed about how this reflects on my department. I am continuing to work on further clarifying how we got to this point and will follow up thereafter with any corrective action that is appropriate. I will keep you advised." (RR. 410a). Weiss replied by email and admitted that "there were serious interpersonal problems" and that certainly he could have seen [the patient] more often and communicated better with his [primary care physician]." (RR. 163a; RR. 218a).

Based on this incident, Dr. Steven Klasko (Klasko), the president and CEO of TJU, and Flomenberg decided to issue Weiss a non-renewal of appointment. On May 4, 2015, Flomenberg gave notice to Weiss that his faculty appointment and employment with TJU would not be renewed and that said appointment and employment would end on June 30, 2016. (RR. 348a). The letter also informed Weiss that he would no longer be the head of his Division effective May 26, 2015, and as a result of the change in his duties, his salary would be reduced. It further stated that, "While initially TJU had

decided to preclude you from actively working during the notice of non-renewal period, it has decided to permit you to actively work through June 30, 2016." The letter contained a release from all claims arising out his employment with TJU including claims related to non-renewal. Weiss did not sign the release and continued working through June 30, 2016.

Jefferson never criticized Weiss' medical judgments but was embarrassed that a prominent donor and Board member chose to leave the care of its hospital and transfer to another hospital. Klasko made clear to Flomenberg that it would be Flomenberg's responsibility to guarantee that a high-profile patient deciding to leave TJU's hospital "could never happen again." (RR. 211a).

**II.**

On September 29, 2015, Weiss filed a multi-count complaint against Jefferson. It alleged that:

- the email exchanges between him and the Administration of the Department of Medical Oncology from December 4, 2014 to February 10, 2015 established that a new contract was entered into between the parties extending his employment for an additional five year period at a combined compensation of $450,000 a year plus benefits.

- because Jefferson did not give notice of non-renewal one year prior to November 15, 2014 of the term set forth in the Agreement, as amended, and that he continued his appointment and employment without any change in duties or compensation,

as a matter of law, his employment contract was renewed under the same terms and conditions.[5]

After discovery was completed and pleadings closed, a three-day non-jury trial was held after which the trial court entered a defense verdict. Weiss filed post-trial motions, which were denied. In its Pa.R.A.P. 1925 opinion, the trial court found that Jefferson never agreed to all the terms that Weiss requested nor did their purported silence on Weiss' proposed terms constitute a ratification and approval of them. The trial court found that Flomenberg, while agreeing to Weiss' proposed terms, did not have actual or apparent authority to bind Jefferson as neither the Dean nor Flomenberg held Flomenberg out as having that authority. Importantly, the trial court found that the evidence established that Weiss did not believe Flomenberg had the authority to bind Jefferson to a contract.

As to the automatic renewal, the trial court found that the Agreement could not have been renewed for another five years because the actions of the parties clearly showed that neither of them wanted the original Agreement to renew. Once the Agreement expired on November 14, 2014, the trial court found that Weiss was an employee "at will." As to whether the employment portions of the Agreement automatically renewed based on a purported lack of notice of renewal, the trial court found that the plain language of Weiss'

---

[5] Weiss also made a claim under the Wage and Hour Law but the claim was not pursued.

contract was unambiguous and only required notice of the non-renewal of his faculty appointment, not his employment agreement with TJU and JUP. Since Weiss received that notice on May 4, 2015, he received all that he was entitled to. This appeal followed.

### III.

### A.

On appeal, Weiss contends that the trial court erred in construing the contractual language contained within the By-Laws by finding that he was only entitled to one-year advance notice that his appointment to the faculty would not be renewed. He contends that under a proper interpretation of that By-Law, as incorporated into the Agreement, both his non-reappointment to the faculty and his non-renewal of a contract are to be treated the same. In other words, the failure to issue notice of non-renewal on or before November 15, 2013, meant that both his Agreement and faculty appointment would be renewed under the same terms and conditions.[6]

_____

[6] Appellate review of a contract requires us to determine whether the factual findings of the trial court are supported by competent evidence on the record and whether the trial court committed an abuse of discretion. **See W.S. Delavau, Inc. v. E. Am. Transp. & Warehousing, Inc.**, 810 A.2d 672, 680 (Pa. Super. 2002). However, while whether a contract is in existence is a factual dispute, the interpretation of any contract is a question of law and this Court's scope of review is plenary. Moreover, we need not defer to the conclusions of the trial court and are free to draw our own inferences. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. When construing agreements involving clear and unambiguous

Jefferson contends that under the Agreement and the By-Laws, Weiss was not entitled to one-year advance notice of non-renewal of his Agreement but only one-year advance notice of the non-renewal to the JCU faculty. It maintains that the Agreement had a five-year term that expired automatically on November 15, 2014, and no advance notice of its non-renewal was required.

Though presented as one issue, Weiss' argument is based on two premises: (1) that he was entitled to one year advance notice that his employment relationship was not going to be renewed; and (2) that if he did not receive a one year notice, his contract automatically extended for five years with the same terms and conditions.[7]

---

terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation. **See Humberston v. Chevron U.S.A., Inc.,** 75 A.3d 504, 509–10 (Pa. Super. 2013) (internal quotation marks and citations omitted).

[7] The fundamental rule in construing a contract is to ascertain and give effect to the intention of the parties. **See Lower Frederick Township v. Clemmer**, 543 A.2d 502, 510 (Pa. 1988). Contracts that refer to and incorporate the provisions of another shall be construed together. **Shehadi v. Northeastern Nat'l Bank**, 378 A.2d 304, 306 (Pa. 1977). "The intention of the parties must be ascertained from the document itself, if its terms are clear and unambiguous." **Sun Company, Inc. (R&M) v. Pennsylvania Turnpike Commission**, 708 A.2d 875, 878 (Pa. Cmwlth. 1998). A contract is ambiguous if it is "reasonably susceptible of different constructions and capable of being understood in more than one sense." **Id.** A determination of whether a contract is ambiguous is a question of law. **See id.** The course of conduct of a party is relevant in interpreting a contract "and may be the

**1.**

As to the first premise, Article IV of the TJU By-Laws provided, in relevant part, "[a]n Associate Professor or Professor without tenure shall be entitled to one year advance notice of non-renewal of appointment[.]" (RR. 318a). Article IV, Section 10 reads, "Any faculty appointment may be terminated in one of the following ways" and lists five subsections titled (A) Resignation, (B) Retirement, (C) Non-Reappointment/Non-Renewal of Contract, (D) Dismissal for Cause, and (E) Termination and/or Suspension of Hospital Privileges. The relevant portion is Subsection (C), "Non-Reappointment/Non-Renewal of Contract." (RR. 320a).

We agree with the trial court that the plain and unambiguous language of the By-Laws only requires an advance notice of non–renewal for faculty appointment, not advance notice of non-renewal of Weiss' Agreement. Weiss' faculty appointment was treated differently under the Agreement from his employment relationship with TJU and JUP. Under the By-Laws, one of the events requiring one-year notice of termination from faculty is the non-renewal of the employment contract. Where, as here, the negotiations did not result in a formal renewal contract signed by all parties, non-renewal of

---

strongest indication of the intention of the parties to the contract." ***Id.*** at 880 (citing ***Atlantic Richfield Company v. Razumic***, 390 A.2d 736 (Pa. 1978)).

contract has occurred. As a result, Weiss was required to receive one-year notice of non-renewal, which occurred on May 4, 2015.

Moreover, that one-year notice of non-renewal of the contract was not incorporated into the Agreement and becomes apparent when considering that a one-year notice must also be given to a Professor or Associate Professor who retires, resigns or is even removed for cause. This again indicates that the one-year notice provision is not an operative provision.

Furthermore, the course of conduct of the parties shows that both Weiss and Jefferson did not consider the one-year notice of non-renewal to apply to employment contracts. It is undisputed that Jefferson intended to renew Weiss' contract until the unfortunate incident with the TJU Trustee. Once the decision not to renew his Agreement was made, then under the By-Laws, the requisite one-year notice was given that his faculty appointment was not going to be renewed. When Weiss rejected Jefferson's July renewal contract, he did not claim that he was required to receive one-year prior advance notice, *i.e.,* a notice on or before November 16, 2013, that his employment was not going to be renewed. Instead, he only asked that the Agreement be kept in place until it expired on November 15, 2014, and received a letter from the Dean confirming that the Agreement was valid until that date. Weiss never claimed during the negotiations that his Agreement had already renewed by virtue of the failure to issue a one-year advance notice of non-renewal.

Jefferson also operated with the understanding that the one-year notice did not apply to employment contracts. It was Jefferson's practice to send a proposed renewal several months before the expiration of the employment contract, which occurred in this case. The renewal contract indicated what Jefferson was prepared to offer and the proposal was either accepted or, as here, negotiations began. If an agreement could not be reached, then the original contract would expire by its own terms.

Simply, the course of conduct of the parties establishes that none of the parties thought or acted as if one-year advance notice of non-renewal applied to employment contracts. *See Herzog v. Herzog*, 887 A.2d 313, 316 (Pa. Super. 2005) (subsequent performance will be given great weight in determining meaning attributed to contract).

**2.**

Even if we agreed that Weiss was entitled to one-year notice of non-renewal of his employment contract, the failure to issue that notice does not mean that the Agreement automatically extended for five years. All that would establish is that Weiss was entitled to one-year notice before his services could be terminated. For the contract to be extended for five years, Weiss would have to establish that the Agreement automatically extended for that term after the stated expiration date.

This leads to Weiss' second argument, that because Weiss' employment with Jefferson continued after November 15, 2014, without any change of

title, position, compensation and responsibilities, his original contract renewed automatically for an additional five-year term.

Generally, when two parties enter into an employment contract for a fixed period of time and then continue acting within the terms of their contract after its expiration, it is presumed that the parties intend to renew their contract for the same period of time as the original agreement and on the same terms as the original agreement. **See Smith v. Shallcross**, 69 A.2d 156 (Pa. Super 1949) (citing 1 Williston, Contracts § 90; 35 Am.Jur., Master and Servant §§ 15, 19, and 56; C.J.S. Master and Servant §§ 8-10); 30 C.J.S. Employer-Employee § 29 (2002); **see also Burge v. Western Pa. Higher Educ. Counsel, Inc.**, 570 A.2d 536, 538 (Pa. Super. 1990) (citing **Shallcross**); **Kapustik v. Sch. Dist. of the City of Arnold**, 111 A.2d 169, 171-72 (Pa. Super. 1955) (same). Without evidence of contrary intent, courts consider such a contract to be impliedly renewed by the actions of the parties. **See id.** The United States Court of Appeals for the Third Circuit has discussed this presumption as follows:

> Thus, general principles of contract law teach us that when a contract lapses but the parties to the contract continue to act as if they are performing under a contract, the material terms of the prior contract will survive intact unless either one of the parties clearly and manifestly indicates, through words or through conduct, that it no longer wishes to continue to be bound thereby, or both parties mutually intend that the terms not survive. The rationale for this rule is straightforward: when parties to an ongoing, voluntary, contractual relationship, which by its nature generally implies that some mutually agreed upon rules govern its configuration, continue to behave as before upon the lapse of the contract, barring contrary indications, each party may generally

- 16 -

> reasonably expect that the lapsed agreement's terms remain the ones by which the other party will abide.

***Luden's, Inc. v. Local Union No. 6 of the Bakery, Confectionery & Tobacco Workers' Int'l Union of Am***., 28 F.3d 347, 355-56 (3d Cir. 1994).

This presumption of renewal can be rebutted by showing that the parties did not actually intend to renew the contract. For example, evidence that the parties were negotiating a new contract rebuts the presumption by negating the inference that either party believed the contract had been renewed. ***See Deutsche Fin. Serv. Corp. v. BCS Ins. Co.***, 299 F.3d 692, 697 (8th Cir. 2002) (quoting ***Consol. Bearings Co. v. Ehret-Krohn Corp***., 913 F.2d 1224, 1230 (7th Cir. 1990)).[8]

In this case, there is more than enough evidence to show that the parties were negotiating a new contract and never envisioned that the Agreement would continue past its expiration date. When Weiss was sent a renewal contract in 2014 renewing his Agreement at the same compensation but with only a three-year term and including no discretionary funds, he rejected it and there continued to be negotiations for the next nine months. This more than overcame the presumption that the Agreement was automatically renewed as neither party wanted to be bound by its terms.

---

[8] This recounting of the case law is largely taken from the unreported opinion in ***Auerbach v. Kantor-Curley Pediatric Assocs., P.C.***, No. 01-854, 2004 WL 870702, at *5 (E.D. Pa. Mar. 22, 2004), which accurately summarizes the law regarding the automatic renewal of employment contracts.

Moreover, when the Agreement expired on November 15, 2014, Weiss, as the trial court found, was performing services on an at-will basis while the new contract was being negotiated. The net result, even if one-year advance notice is required, would be that his at-will status would only continue for a year. He received such notice.

**B.**

Weiss also contends that there was a contract implied in fact because of the outward manifestations of Jefferson accepting the terms of his proposed revisions to the Agreement.

In **Bricklayers of W. Pennsylvania v. Scott's Dev. Co.**, 41 A.3d 16 (Pa. Super. 2012), *reversed on other grounds*, 90 A.3d 682, 697 (Pa. 2014), we set forth what needs to be established for a contract to be "implied in fact" stating:

> "A contract implied in fact has the same legal effect as any other contract. It differs from an express contract only in the manner of its formation. An express contract is formed by either written or verbal communications." **Ingrassia Constr. Co. v. Walsh**, 337 Pa. Super. 58, 486 A.2d 478, 483 n. 7 (Pa. Super. 1984). "A contract implied in fact[ ] is an actual contract, and ... arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from their acts in the light of the surrounding circumstances." **Tyco Elecs. Corp. v. Davis**, 895 A.2d 638, 640 (Pa. Super. 2006) (citation and internal quotation marks omitted). "A contract implied in fact can be found by looking to the surrounding facts of the parties' dealings. Offer and acceptance need not be identifiable and the moment of formation need not be pinpointed." **Ingrassia Constr. Co.**, 486 A.2d at 483. "Implied contracts ... arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract." **Id.**

*Id*. at 29-30.

It was Weiss' burden to prove the existence of an implied in-fact contract by establishing that Jefferson intended for the Agreement to "become operative before execution and without regard to a writing" and that there was a "meeting of the minds" on all terms. *Onyx Oils & Resins, Inc. v. Moss*, 80 A.2d 815, 817 (Pa. 1951); *GMH Assocs., Inc. v. Prudential Realty Grp*., 752 A.2d 889, 900 (Pa. Super. 2000). Weiss contends that he met that burden because (1) Flomenberg "approved" all of the terms that he sent in his proposed agreement; (2) the Dean approved his increased compensation; (3) Jefferson never rejected his terms nor told him there was any problem with a five-year term at the agreed increased compensation; and (4) no contrary or other terms were ever proposed or presented to him.

However, the trial court accepted Flomenberg's testimony that he did not purport to approve the proposed terms on behalf of Jefferson. He, instead, testified that he "agreed that Weiss' salary should be increased" and that he "thought it was inappropriate that Weiss had done five years without a substantial increase" as well as telling Weiss that he "had no objection" to them. (RR. 148a; RR. 150a). The trial court also accepted Flomenberg's testimony, corroborated by Curran, that Flomenberg was acting as an advocate for Weiss when asking Decision Support and the Dean for binding acceptance of the new terms. These comments did not manifest an intent to be bound by them. Not only did the trial court find that Flomenberg did not

"approve" those terms, it went on to find that Weiss knew Flomenberg did not have the authority to agree or approve any terms on Jefferson's behalf.

As to whether the Dean "approved" the increase, Weiss relies on Ravenfeld's January 9 email and Curran's February 10 email as purported evidence of this approval. Ravenfeld's January 9, 2015, email to Karen Novielli and others stated that he "spoke to the Dean about Mark Weiss' new contract," and "He is ok with the salary as proposed ($400k + $50k incentive..." and "He is also ok with the $100k of discretionary support..." (RR. 470a-471a). Curran then emailed Weiss on February 10, 2015, that "I have be[en] given the go ahead for your new comp." (RR. 346a). However, that email went on to state that the Dean rejected a material term Weiss requested - the five-year term, identified conditions to the Dean being "ok" with the increased salary (*i.e.*, getting "weigh in" from attorneys) and, in any event, placed caveats on the salary and discretionary funding.

All we have here are internal discussions on a contract renewal that all parties, including Weiss, believed would ultimately culminate in a written contract. And while the Dean may have been "ok" with and conditionally agreed to an increase in salary and discretionary spending, he specifically did not approve the five-year term. Just because one party agrees to one of the terms does not mean the parties have entered into an implied in-fact contract regarding all other terms; it is only when all the material facts have been agreed to that there can be a contract. "Absent a manifestation of an intent

to be bound, however, negotiations concerning the terms of a possible future contract do not result in an enforceable agreement." ***Philmar Mid-Atl., Inc. v. York St. Assocs. II***, 566 A.2d 1253, 1255 (Pa. Super. 1989) (internal citations omitted).

Moreover, even if the Dean had internally approved all of Weiss' proposed terms, that does not mean that a contract implied in-fact has been formed. "[T]he law is not concerned with the secret, inner workings of a party's mind, the terms and conditions of the promise must be determined through reference to those outward manifestations properly in evidence." ***Mickshaw v. Coca Cola Bottling Co. of Sharon, Pa.***, 70 A.2d 467, 469 (Pa. Super. 1950). Here, just because Weiss learned of otherwise "internal" Department or Decision Support correspondence was not an outward manifestation that Jefferson accepted his terms and conditions but merely showed the inner workings of Jefferson's mind. Even if the Dean had agreed internally to Weiss' requests, those internal discussions and statements are not an outward manifestation on which to establish mutual assent to an implied contract on those terms.

As to his third claim that Jefferson accepted his terms and conditions because Jefferson never rejected his proposed terms set forth in the draft contract as forwarded to Decision Support on December 29, 2014, or that Jefferson failed to tell him there was any problem with his proposed terms or failed to propose alternative terms, we disagree. The trial court found that

Weiss was well aware that there were problems getting his renewal contract executed on the terms that he requested. Curran testified that in January and February 2015, he continually discussed with Weiss "where his contract stood" and told him "[t]hat it was still pending review." (RR. 243a-244a). Curran's February 10 email said, "I don't have a contract to share with you..." **See** February 10, 2015 email. (RR. 346a-347a). This would inform any reasonable person that his renewal contract had not yet been approved.

Because Weiss has established no outward manifestation that the parties had mutually assented to his terms and conditions, the trial court properly found that Weiss did not establish that an implied contract existed.

**IV.**

Weiss also contends that we should reverse the trial court's decision because the judgment is against the weight of the evidence, constituting a manifest injustice and shocks the conscience that no reasonable person would have condoned Jefferson's conduct and ruled as the court did here. However, the trial court verdict is not in any way irrational and it issued a well-reasoned opinion as to why it arrived at the decision based on its interpretation of the contract with which we agree. Accordingly, Weiss has not established a basis for a new trial.

**V.**

For all of the foregoing reasons, we affirm the Order and Judgment of the trial court in Jefferson's favor on all of Weiss' claims.

- 22 -

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/17/19